THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KATRINA KOSTATINOVICH, Defendant-Appellant.

Second District    No. 80-648

Opinion filed July 28, 1981.

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellant.

Fred Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE HOPF delivered the opinion of the court:

Defendant was convicted after a bench trial of theft of property of over $150 in value and was sentenced to a two-year term of imprisonment in the Illinois State Penitentiary.

On appeal, the defendant raises three issues: (1) whether the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt; (2) whether there was a valid jury waiver by the defendant; and (3) whether the defendant was denied a fair trial when the trial court stated at the close of the State's case, and in response to the defendant's motion for a directed verdict, that the defendant was guilty. We hold that

the evidence was insufficient to establish defendant's guilt beyond a reasonable doubt, and reverse.

At trial, Robert Thomson, one of the proprietors of Spina's Log Cabin, a grocery and liquor store located in Mundelein, Illinois, testified that on December 23, 1979, about 2:30 or 3 p.m. his wife called him into the store area from the stockroom. Upon entering the store area, he observed persons whom he described to be gypsies in the store. He called his son, James, and another employee, who were down in the basement, and requested that they come into the store area. He then took a head count and determined that there were four gypsies in the store.

Mr. Thomson further testified that two of the gypsies approached him. One of the women was asking him about prices on different merchandise and another was tugging at his shoulder, asking him the price of the "Twinkies" on the rack. Eventually, one of the women took him by the arm and led him over to the baby food area. The woman asked him questions about infant formula and baby food. Mr. Thomson estimated that he was with this woman in the baby food section for approximately five to eight minutes. Thomson's wife, Divina, was with another gypsy woman at the counter, and Thomson's son and another employee, John Wales, were also kept occupied by two other gypsy women.

Mr. Thomson testified that after he had been with the gypsy woman in the baby food area for approximately five to eight minutes, he observed three more gypsy women, whom he had not seen earlier, coming down the aisle. The first woman in this group was pushing a shopping cart containing only a loaf of bread. The woman abandoned the cart, shoving it in front of Thomson, and went out the door. The third woman in the group stood at the corner of the counter and said something in a foreign language. The other women all joined her and immediately left the store. Thomson identified defendant as the woman who spoke. Thomson stated that when he had entered the store its only shopping cart had been parked in front of double-swinging doors leading to the family living quarters where the store office was located.

Immediately after the women left the store, Thomson went upstairs to his office and found that checks and cash in a desk drawer were missing. He also found a silver coin in the hallway on the stairs leading down into the store area. Thomson stated that he had been upstairs just before two o'clock and had not seen nor heard anyone upstairs while he was in the stockroom.

On cross-examination Thomson admitted that he never saw the defendant near the back of the store where the cart had been parked. He also stated that he never saw defendant with any of his property.

James Thomson, the son of Robert Thomson, testified that on the afternoon of December 23, 1979, he was down in the basement with one

of the store employees, John Wales. His father called down to him and he came upstairs. When he came out of the storeroom area he saw two women standing beside the cooler and one by the swinging doors leading to the family living quarters. As he walked toward the swinging doors, James was stopped by a woman who took him to the corner where the medicine was stacked and then to the magazine area. The woman picked up items off the shelf and asked about several more items. However, she did not purchase anything. James estimated that he was with the woman and in the magazine area for approximately five to ten minutes. Subsequently, the woman went out the door and another woman came over to him. James then saw approximately seven women going out the door. He identified defendant as one of the women who left the store. He had not seen her until she was walking out the door.

Divina Thomson, a part-owner of the store, testified that at approximately three o'clock on the afternoon of December 23, 1979, she was working behind the counter of the store. A group of ladies, wearing long dresses and earrings, came in. One lady "cornered" Mrs. Thomson at the counter and began asking her questions. Mrs. Thomson testified that when the women entered the store she called her husband right away "because I knew their traits." During this time, Mrs. Thomson was waiting on other customers and the gypsy woman told her to take care of the other customers first. The gypsy eventually bought a bottle of wine and some fruit. Mrs. Thomson estimated that approximately seven women left the store, although she had seen only five women prior to that time. She identified the defendant as one of the women in the store on that afternoon. After the gypsy women left, Mrs. Thomson went upstairs to the living quarters and found her coin collection missing.

On cross-examination, Mrs. Thomson testified that there were approximately five to six other people in the store at the same time as the gypsy women were in there and that one nongypsy woman had been in the back of the store. Mrs. Thomson further admitted that she did not see any of the gypsies go into the residence or come down from the residence.

John Wales, an employee at the time of the occurrence, testified that on the afternoon in question he was working in the basement with the owners' son. Mr. Thomson called him upstairs and he observed ladies dressed in long skirts. He went up to see if he could help them. One of the women grabbed his arm and said, "I want champagne." She kept pointing to things that she wanted although she did not purchase anything. Wales testified that suddenly everybody disappeared.

The defendant testified that on December 23, 1979, at the time that the theft was allegedly committed, she had a job at a restaurant and bar in Chicago and worked from noon to 7 p.m. washing dishes. She stated that she never left Chicago that day.

■■ ■ To sustain a conviction of theft, the State must prove beyond a reasonable doubt that the property was in fact stolen and that the defendant knowingly exerted control over the stolen property intending to deprive the owner of its use. (*People v. Thompson* (1975), 35 Ill. App. 3d 105, 340 N.E.2d 631.) The State does not contend that defendant herself took the Thomsons' property but that she was a participant in the scheme to steal the property. The State must prove, then, that defendant aided and abetted the person or persons who actually took the property. (*Thompson.*) In the instant case, the State established that the Thomsons' property was missing after the gypsy women left the store, and that the defendant was one of the women present that afternoon. However, none of the gypsies, including defendant, were seen upstairs or near the living quarters. Defendant was not seen near the double doors, from which vantage the State had suggested she had acted as lookout. Further, the witnesses testified that there were other people in the store at the same time that the gypsy women were there and that at least one nongypsy was in the rear of the store. This evidence raises little more than a suspicion that defendant was involved in the theft and leaves a grave and serious doubt of guilt. It is insufficient to establish accountability for the offense. *People v. Thompson; cf. People v. Grice* (1980), 87 Ill. App. 3d 718, 725, 410 N.E.2d 209.

■■ Where, as here, the evidence against the defendant is entirely circumstantial, the facts proved "must not only be consistent with the accused's guilt but must also be inconsistent with any reasonable hypothesis of innocence [citations], or the facts produced must so thoroughly establish the defendant's guilt as to exclude every reasonable hypothesis of innocence [citation]." (*People v. Grice* (1980), 87 Ill. App. 3d 718, 725.) The evidence against the defendant does not meet this standard of proof. It is not inconsistent with a hypothesis that defendant was innocent of any involvement in the theft.

The above issue is dispositive of this appeal, and we need not address defendant's remaining arguments. With respect to the contention regarding the jury waiver, however, it might be well to mention that we think when counsel represents to a court that his client, who speaks no English, waives her right to a jury trial, the court should make an effort to determine that she was sensible of that fact. See *People v. Ortiz* (1981), 96 Ill. App. 3d 497, 421 N.E.2d 556.

Reversed.

LINDBERG and NASH, JJ., concur.