THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
STUART SMITH, Defendant-Appellant.

Second District   No. 82—641

Opinion filed June 6, 1984.

John S. Biallas, of St. Charles, and Randy Johnson, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Raymond L. Beck, both of State's Attorneys Appellate Service Commission, of Elgin, and John X. Breslin and Rita Kennedy Mertel, both of State's At-

torneys Appellate Service Commission, of Ottawa, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant was found guilty of misdemeanor theft (Ill. Rev. Stat. 1981, ch. 38, par. 16—1(a)) after a bench trial in the circuit court of Kane County. The circuit court enhanced his sentence to a Class 4 felony after finding that he had been convicted of a prior theft (Ill. Rev. Stat. 1981, ch. 38, par. 16(e)(1)) and sentenced him to one year in the Department of Corrections. He argues on appeal that the trial court erred in denying his motion to suppress evidence discovered in the trunk of his car and that the State failed to prove him guilty beyond a reasonable doubt of theft.

The defendant and Samuel Haley were charged by indictment with burglary and theft in that they knowingly exerted unauthorized control over property of another in excess of $300 with the intent to deprive its owner permanently of its use. The State *nolle prossed* the charges against Haley. Prior to trial, the defendant filed a motion to suppress evidence seized from the trunk of his car. The hearing on this motion and his trial were held concurrently.

Aurora Patrolman Charles Davis testified that after receiving a radio call at 10:01 p.m. on January 1, 1982, concerning a burglary on North May Street, he drove to the 700 block of May Street and parked his marked squad car. After a short period of time, he saw in his rear view mirror a white Thunderbird pull out of a parked position from the 800 block. The car's headlights were not on. The officer followed the car as it circled the block, observing that it traveled at a higher than normal rate of speed, and eventually stopped in a driveway at 713 North May Street, the defendant's residence. The driver, identified at trial as the defendant, exited the car and walked toward the squad car as Officer Davis exited the squad car and walked towards the defendant's car. Officer Davis requested identification from defendant and informed him that he stopped him for driving without the headlights on. The officer granted the defendant's request to get identification from his home after being informed that the defendant did not have his driver's license on his person. The passenger in the car then identified himself as Samuel Haley.

When the defendant returned, Officer Davis told him that he stopped the car because a burglary had just occurred and his car pulled out in a suspicious manner without its headlights on. The defendant responded that he was leaving from the house of his friend, Johnny. The officer informed him that a television had been taken and

asked if he could look in the car's trunk. Officer Davis opined that he asked this question in a manner in which the defendant could have declined to grant him permission to look in the trunk. The defendant told him that there was a television in the trunk of the car which belonged to Johnny who had left it in there after the defendant helped move some of his property. Officer Davis responded that if he saw the television he could determine if it came from the burglary and the defendant then opened the trunk. The black and white television found in the trunk was one which was stolen in the burglary. Officer Davis denied that he verbally or physically coerced the defendant to open the trunk and, having no basis to believe that the defendant committed the burglary, wanted to give the defendant the opportunity to clear himself.

After placing the defendant under arrest, the defendant volunteered that he was not involved in the burglary and that Johnny had taken the property. He directed the police to a shed in back of 804 North May Street, Johnny's address, where other proceeds of the burglary were located: two stereo speakers and a stereo component. While being transported to the police station and during the booking process, the defendant continued to deny involvement in any burglary and blamed Johnny. He told the officers that Ronnie Simmons and Johnny were probably selling the color television, also taken from the burglary, at that very moment.

Sergeant Jeff Nelson of the Aurora police department who, along with Officer Johnson, gave *Miranda* warnings to the defendant the next morning, testified that the defendant told them that he had been home with friends on January 1 when Johnny, also referred to as Baby Johnny and known as John Reyes, arrived with the black and white television and stereo and offered to sell them to him and the others. After no one cared to purchase them, and he refused to store them in his home for Johnny, he agreed to drive Johnny and these items to Johnny's home. The defendant knew they were stolen from what Johnny had told them. He admitted aiding Johnny in moving the items. He further indicated, however, that he never intended to keep any of the items. At the time he was arrested, the defendant had just dropped Johnny off, and intended to drop Haley off, and then return to pick up Johnny and take him to another part of town.

The parties stipulated that Officer Mark Johnson's testimony would be the same as Sergeant Nelson's testimony.

Evidence established that the residence where this property was located had been broken into that evening. The value of the property taken was less than $300.

Some of the people who were present with the defendant at his home on January 1 testified in his behalf. Samuel Haley said that he arrived at the defendant's home around 1 p.m. and watched TV with the others. The defendant remained home the entire time. Johnny, whom he had never met before, arrived at 10 p.m. He was sweaty and breathing hard, and carried a stereo component. He asked the defendant if he wanted to buy it and the defendant refused. Around 20 minutes later, he brought in two speakers and then later the television. The defendant told him to take those items out of his house and refused to let him leave them there. The defendant agreed to drive Johnny to Johnny's mother's house. He never handled the items. At Johnny's house, Johnny removed the component and speakers from the trunk but left the television in the trunk so that he could take it to a party. When they left Johnny's house, they were going to go back to the defendant's house and pick up his girlfriend, Diane, drop off Haley at his house, and then pick up Johnny to take him to the Holiday Inn.

Diane Garcia testified that Sam Haley arrived in the early afternoon. She and the defendant went to her mother's house at 1:30 p.m. and returned home at 3:30 p.m. Johnny arrived that evening while she was watching a movie on television in the living room. He went into the basement to join the defendant and Sam Haley. He returned to the living room, went back into the basement, and then left and returned carrying speakers. She saw the defendant open the trunk and Johnny place the items in it when the defendant agreed to drive Johnny home.

Ronald Simmons testified that he arrived at the defendant's home at 8:30 p.m. While watching television in the living room, the defendant, Sam Haley, and Johnny Skaggs went into the basement at around 9:30 p.m. At around 10:15 to 10:30 p.m., the defendant came up with Baby Johnny. When he first saw Baby Johnny, he was breathing hard and sweating. He followed Johnny downstairs where he saw the television and component which Johnny asked him if he wished to purchase. Later, Johnny brought in the speakers. The defendant told Johnny to get the stuff out of his house. At a later date, Baby Johnny told him that he committed the burglary himself.

On rebuttal, Officer Jeffrey Nelson testified, to impeach Sam Haley, that Sam Haley told him that "they" took the property to the car and that Johnny and the defendant removed the property from the car and placed it in the shed. His police report referred to "they" without mentioning any names. He further said that Sam told him that the defendant was going to take Johnny to the Holiday Inn area

to sell the television. The officer further testified that Ronald Simmons told him that he never went into the basement that evening, and that Diane told him that she never saw the television or the stereo.

The trial judge found the defendant not guilty of burglary and guilty of misdemeanor theft. After denying the defendant's post-trial motion, and finding that the defendant had been convicted of a prior theft, the judge sentenced him to one year in the Department of Corrections on June 14, 1982.

The defendant appealed, raising these issues:

> (1) Whether defendant's consent to the search of his car was free and voluntary and not vitiated by the police officer's failure to advise him of his *Miranda* rights or failure to have sufficient grounds to believe that defendant had participated in criminal activity when he stopped defendant for a traffic violation; (2) Whether the State proved beyond a reasonable doubt that defendant exerted unauthorized control over stolen property with the intent to deprive its owners permanently of its use where defendant was arrested in possession of stolen property.

The defendant urges that the trial court erred in denying his motion to suppress. He claims that if police officer Davis stopped his car for a traffic violation, the officer had no basis on which to search the trunk. In the alternative, the defendant argues, if police officer Davis stopped his car for suspected criminal activity, he was entitled to be advised of his *Miranda* rights prior to any questioning. Defendant fails, however, to cite any authority in support of the above contentions. He continues that the State failed to prove by clear and positive testimony that his consent to the search of the trunk was not the result of duress or coercion, actual or implied, but was unequivocal, specific, and freely and intelligently given, citing *People v. Haskell* (1968), 41 Ill. 2d 25, *overruled on other grounds by People v. Nunn* (1973), 55 Ill. 2d 344, *cert. denied* (1974), 416 U.S. 904, 40 L. Ed. 2d 108, 94 S. Ct. 1608.

■ The trial court denied the defendant's motion to suppress on the basis that the defendant gave a valid and voluntary consent to Officer Davis' request to look inside the trunk of his car. It is well established that a party may consent to a search conducted without a warrant but, that in order for the consent to be considered a waiver of his fourth amendment rights, the State must prove by a preponderance of the evidence that the consent was voluntarily given. (*People v. Holliday* (1983), 115 Ill. App. 3d 141, 143.) The voluntariness of a

consent depends not upon any single criterion but, rather, upon all of the circumstances under which the consent was given. (*People v. Wahlen* (1982), 111 Ill. App. 3d 194, 196.) Since the voluntariness of the consent is a factual question, the trial court's finding in this regard will be upheld unless it is found to be clearly unreasonable. *People v. Salgado* (1980), 83 Ill. App. 3d 653, 656.

■ The record supports the trial court's determination in this regard. The evidence affirmatively establishes that Officer Davis' conduct *vis-a-vis* defendant did not coerce him into consenting to the search. The officer had a legitimate basis on which to stop the defendant for a traffic violation. He never restrained the defendant and permitted him to leave the scene of the stop in order to get identification. He explained the reason why he wished to look in the trunk of the car and opined that he asked the question in a manner so that the defendant could decline. (*Cf. People v. DeLisle* (1982), 104 Ill. App. 3d 297, 300-01 (a consent may be involuntary where the defendant must choose between consenting or being arrested).) Although Officer Davis did not advise the defendant that he could refuse to consent, the law does not mandate such an advisement, although it is a factor to be considered in determining the voluntariness of the consent. (*People v. Haskell* (1968), 41 Ill. 2d 25, 31; *People v. Wahlen* (1982), 111 Ill. App. 3d 194, 197.) Indeed, ignorance of knowledge of the right to refuse to consent does not vitiate the voluntariness of the consent. (*People v. Brett* (1984), 122 Ill. App. 3d 191, 196.) Under these circumstances, it is clear that the defendant could have declined to grant Officer Davis permission to search the trunk of the car and that his decision to grant the request was free and voluntary. The defendant's decision to permit the search of his car may be viewed as tactical. The defendant may have believed that cooperation with the police would enable him to clear himself of the charges or to receive leniency.

■ The defendant argues his case by proposing that Officer Davis either stopped him for a traffic violation and thus had no basis to suspect him of criminal activity in relation to the burglary, or suspected him of such criminal activity and thus, since he was the person on whom the investigation had centered, needed to advise him of his *Miranda* rights prior to posing any questions. This analysis ignores the third possibility which the facts indicated occurred here: that Officer Davis stopped the defendant for a traffic violation *and* suspected him of criminal activity in relation to the recent burglary. The defendant does not contest that Officer Davis had a legitimate basis upon which to stop him. After the stop, nearby the scene of the burglary,

the officer's subsequent inquiry concerning the recent burglary resulting from the arousal of his suspicions can be deemed permissible as an on-the-scene inquiry. See *People v. Gore* (1983), 116 Ill. App. 3d 780, 784.

This questioning of the defendant did not require Officer Davis to administer *Miranda* warnings to the defendant since the defendant was not in custody based upon criminal activity related to the recent burglary. As the court noted in *People v. Ricketson* (1970), 129 Ill. App. 2d 365, 377, where a motorist who has been stopped and arrested for a motor vehicle violation is questioned regarding other possible criminal offenses because of the then existing suspicious circumstances, he is not subject to custodial interrogation giving rise to the requirement that *Miranda* warnings be administered. (See also *People v. Helm* (1973), 10 Ill. App. 3d 643, 647-48.) Furthermore, even if the defendant was in custody, the lack of *Miranda* warnings would not vitiate the defendant's consent since they are not required prior to obtaining consent. As the court found in *People v. Wegman* (1981), 101 Ill. App. 3d 634, 638, continued questioning of a defendant after *Miranda* warnings had been given and the defendant requested an attorney did not vitiate the subsequent consent since *Miranda* warnings apply to incriminating evidence of a testimonial nature. Thus, while courts will consider whether a defendant had been given *Miranda* warnings prior to consenting to a search, it is only one factor to consider in determining the voluntary nature of the consent. See *People v. Meddows* (1981), 100 Ill. App. 3d 576, 583, *cert. denied* (1982), 459 U.S. 855, 74 L. Ed. 2d 107, 103 S. Ct. 123.

The defendant's attempt to distinguish *People v. Ricketson* (1970), 129 Ill. App. 2d 365, is unpersuasive. In *Ricketson*, an Itasca police officer followed and then stopped a car which was in violation of the State motor code. After the defendant identified himself, the police officer, without mentioning the existence of a code violation, noted that the defendant was from Chicago and asked him what he was doing in the area. The officer observed a briefcase in the rear seat of the car with embossed initials differing from those of the defendant and asked him what was in it. The defendant opened the briefcase for him in which burglary utensils were uncovered. A television and radio were then uncovered when the defendant lifted a blanket which had been lying over them. The court found that the consent to the search of the briefcase was valid and once burglary utensils were discovered, probable cause arose to search the remainder of the car. (129 Ill. App. 2d 365, 372.) The court continued that while the stop was technically an arrest, *Miranda* warnings were not required. (129 Ill. App. 2d 365,

377.) The defendant here argues that *Ricketson* is factually distinguishable because the circumstances there indicated that the police officers were able to determine that something other than a routine traffic violation was involved. However, rather than distinguishable, it appears that in the instant case, similarly, Officer Davis believed that something other than a traffic violation was involved based upon the suspicions aroused when the defendant's car pulled away from a location near the burglary without its lights on and traveling at a faster than normal rate of speed.

■ The defendant's concluding remark that the request to search the trunk constitutes the functional equivalent to a solicitation for incriminating information and thus requires *Miranda* warnings lacks merit. Indeed, the defendant has not cited any case authority to support this proposition and research discloses none. As the above analysis explains, courts have found that a defendant's lack of knowledge that he need not consent to the search or the failure of the police officer to inform him of his right to refuse to consent does not vitiate the consent. Therefore, the trial court did not err in denying the defendant's motion to suppress.

■ ■ The defendant next argues that the State failed to prove beyond a reasonable doubt that he knowingly exerted unauthorized control over stolen property and that he intended to deprive the owner permanently of its use. Since all of the witnesses in defense testified that he wanted to remove Johnny and the stolen items from the premises and only drove Johnny and the items to accomplish this end, the evidence, according to the defendant, does not establish that he had a criminal intent. He further urges that he cannot be held accountable for the acts of Baby Johnny because the evidence is circumstantial and his acts can be attributed to an innocent cause-to get Johnny and the items out of his home.

To sustain a conviction of theft, the State must prove beyond a reasonable doubt that the property was in fact stolen and that the defendant knowingly exerted unauthorized control over the stolen property intending to deprive the owner permanently of its use. (*People v. Kostatinovich* (1981), 98 Ill. App. 3d 611, 614.) A defendant can be found guilty of theft solely on the basis of knowingly exerting unauthorized control over the property of another at the time of arrest because the crime of theft is not limited to the original taking of the property. (*People v. Sherman* (1982), 110 Ill. App. 3d 854, 857.) Generally, the intent to permanently deprive the owner of the use of the property is proved by circumstantial evidence. (110 Ill. App. 3d 854, 859.) It can be inferred from all of the facts and circumstances of the

case including the defendant's recent, exclusive and unexplained possession of stolen property. (*People v. Martin-Trigona* (1982), 111 Ill. App. 3d 718, 722.) When the theory of guilt is based not upon the taking of the property but upon the exertion of unauthorized control, the State need not show that the possession was recent. (*People v. Mertens* (1979), 77 Ill. App. 3d 791, 796.) Without a reasonable explanation by the defendant, his recent and exclusive possession of stolen property gives rise to an inference of guilt which can sustain a conviction in the absence of other facts and circumstances which leave in the mind of the trier of fact a reasonable doubt as to the guilt of the accused. *People v. Sherman* (1982), 110 Ill. App. 3d 854, 859.

■■ In the instant case, the record indicates that the State attempted to prove at trial that the defendant took the property as well as exerted unauthorized control over it. (See *People v. Petitjean* (1972), 7 Ill. App. 3d 231, 233.) The trial court, which found the defendant not guilty of burglary, appears to have relied upon the latter theory in finding the defendant guilty of theft. The defendant, nevertheless, argues that evidence setting forth an explanation for his possession of the stolen property precludes the finding of guilt. However, to negate the inference of guilt, the explanation offered by the defendant must be reasonable, a fact question for the trier of fact. (*People v. Tribett* (1977), 54 Ill. App. 3d 777, 782.) Indeed, a defendant's explanation may be rejected even if it remains uncontradicted. (*People v. Sherman* (1982), 110 Ill. App. 3d 854, 860-61.) As the court explained in *People v. Hanson* (1968), 97 Ill. App. 2d 338, 342:

> "When the courts speak of an explanation they do not mean that any explanation overcomes the inference of guilt. It must be a satisfactory explanation—one that the trier of fact finds reasonable and acceptable. This does not mean that a defendant must assume the burden of giving a satisfactory explanation for the possession of stolen property or be found guilty if he does not, for the burden is always upon the State to prove him guilty beyond a reasonable doubt. It does mean, however, that the inference arising from the recent and exclusive possession of stolen property casts the burden of going forward with the evidence upon the defendant. If no explanation is made the inference maintains and the weight to be given it is for the trier of fact to decide. If an explanation is made, the acceptance or rejection of the explanation is also for the trier of fact."

■■ In the instant case, the trial court as fact finder must have disbelieved that the defendant did not intend to deprive the owner permanently of the stolen property. Since this factual finding is not

improbable, no reasonable doubt has been raised as to the defendant's guilt. Indeed, the evidence adduced at trial reveals contradictions in the defendant's theory. For example, the defendant's statements to the police that Ronnie Simmons and Johnny were probably selling the color television at that very moment belies his theory at trial that he was stopped shortly before he was going to pick up Johnny and take him to another place. Furthermore, several of his witnesses were impeached by the testimony of Officer Nelson relating statements they made. Therefore, the trial court's finding that the defendant committed theft should be affirmed.

■■ The defendant further argues that he was not proven guilty beyond a reasonable doubt under the doctrine of accountability, relying solely on *People v. Trapps* (1974), 22 Ill. App. 3d 1029. However, that case is inapposite because the defendant was found guilty there of theft based on the taking of the property. (See *People v. Kostatinovich* (1981), 98 Ill. App. 3d 611, 614 (where State establishes theft by taking and that defendant participated but not that the defendant took the property, it must prove that the defendant aided and abetted the person or persons who actually took the property).) Here, the defendant's possession of the stolen television would support his conviction either as a principal or under the accountability doctrine. His act of transporting the television represents an act aiding and abetting the commission of the offense of theft by possession.

The judgment of the circuit court of Kane County is affirmed.

Judgment affirmed.

HOPF and NASH, JJ., concur.