NO. 4-00-0587

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,   )    Appeal from 

Plaintiff-Appellee,    )    Circuit Court of

    )    Mason County

PAUL T. RAIBLEY,    )    No. 98CF94

Defendant-Appellant.    )

    )    Honorable

    )    Thomas L. Brownfield,

    )    Judge Presiding.

JUSTICE APPLETON delivered the opinion of the court:

After a bench trial, the trial court found defendant, Paul T. Raibley, guilty of two counts of child pornography (720 ILCS 5/11-20.1(a)(1)(vii) (West 1998)) and two counts of residential burglary (720 ILCS 5/19-3 (West 1998)).  The court sentenced him to 12 years' imprisonment for each count, ordering that the terms run concurrently with each other but consecutively to a 10-year term of imprisonment that the United States District Court for the Central District of Illinois imposed, for the same conduct, in 
United States v. Raibley
, No. 98-CR-40058.  
Defendant appeals on several grounds, but we need consider only one:  that the trial court erred in finding defendant had consented to a police officer's taking the incriminating videotape from his pickup truck to the county jail and viewing it there.  We agree with that contention and therefore reverse the trial court's judgment as well as the conviction on all four counts.   

I. BACKGROUND

On October 14, 1998, the State's Attorney filed six counts against defendant in the Mason County circuit court.  Count I alleged:

"[O]n September 13, 1998, in Mason County[,] [defendant] committed the offense of [child pornography] in that *** defendant knowingly [videotaped] 
Jane Doe, a child whom *** defendant knew to be under the age [18] years, while [the] child was the object of lewd exhibition of the unclothed buttocks of another person [
sic
] ***."

Count II was identical to count I, except it alleged that defendant videotaped Jane Doe "while [the] child was depicted in a setting involving the lewd exhibition of the unclothed genitals of [the] child."  

The State dismissed count III prior to trial, and the trial court acquitted defendant of count IV, predatory criminal sexual assault (720 ILCS 5/12-14.1(a)(1) (West 1998)).

Count V alleged:

"[O]n September 13, 1998, in Mason County, [defendant] committed the offense of [residential burglary] in that *** defendant knowingly and without authority entered the dwelling place of John Doe, located in Havana, Mason County, Illinois, with intent to commit therein a felony of child pornography ***."

Count VI repeated count V verbatim.

The trial court found defendant guilty of counts I, II, V, and VI.

Defendant filed a pretrial motion to suppress the videotape of John Doe's children, arguing that by shrugging, he had not given the police permission to seize and view the videotape.  At the hearing on the motion, only witnesses for the State testified, and no significant factual discrepancies emerged from their testimony.  Neither attorney argued that the witnesses were incorrect in their recitation of the historical facts, although they disagreed on the inferences one should draw from those facts.

Eric Lindburg was a police officer for Aledo, Illinois.  He testified that on October 10, 1998, at 4:13 p.m., he was dispatched to Wal-Mart in Aledo, where a man was reportedly videotaping employees entering and exiting the store.  At Wal-Mart, Lindburg spoke with a store manager, who described a short, red-haired man in a small, white pickup truck.  She remembered a portion of the license-plate number.  She said the man had become nervous and left in a hurry when she noticed he was videotaping an employee.  Lindburg testified he also spoke with the employee whom the man had videotaped, a 17-year-old female.  The teenager never noticed the man, but the manager had "told her there was a guy videotaping her from the parking lot as she was walking in."  No one suggested the man was armed or dangerous in any way.

Seeing no white pickup truck in the parking lot, Lindburg resumed his regular patrol.  Over the radio, he requested other police officers to keep an eye out for the truck, because he wanted "to speak to the individual."  About an hour later, he cruised by Wal-Mart again; this time the truck was in the parking lot, but no one was in the truck.  Lindburg testified he ran the license plate and ascertained the truck belonged to defendant.  He then went into Wal-Mart to ask the manager if she saw the man in the store.  While talking with the manager, he glanced over his shoulder and saw the truck speeding out of the parking lot.  Lindburg ran to his patrol car and radioed that the truck had just left the parking lot at a high speed and was going west on the highway.  He pursued the truck in his patrol car but lost sight of it.  He did not intend to write a citation because speeding in a parking lot was not illegal.  He merely wanted to talk with defendant because his hasty departures from the parking lot were suspicious and Lindburg was concerned he might have been stalking the teenager.

Lindburg spotted the truck a mile down the highway at the four-way intersection in the center of Aledo.  A Mercer County deputy sheriff, Sean Hast, had stopped the truck by angling his patrol car 10 feet in front of it.  Both Lindburg and Hast had turned on the overhead emergency lights of their patrol cars.  Lindburg testified:  "[Defendant] had his hands out of the window[,] *** and [Hast] had him get up against the vehicle and [began] to pat him down."  Hast "may have had his hand on his firearm in the holster yet or near it."  Defendant appeared surprised and nervous.  Lindburg told Hast, "['][N]o, he is not under arrest.  I just need to speak with him.'"  Lindburg then stated, "[Hast] said [']okay,['] and I believe he apologized to [defendant] and got in his vehicle and drove off."  

After assuring him he was not under arrest, Lindburg "asked [defendant] if he would mind speaking with [him] around the corner[.]  [I]f he wanted to pull his vehicle around[,] there [was] a parking spot."  After he and Lindburg moved out of the intersection, Lindburg might have patted defendant down again, but he was uncertain.  Defendant was "still shaking, a little nervous."  Lindburg asked him why he had videotaped the Wal-Mart employee.  Defendant asked if it was illegal to videotape a person in a parking lot.  Lindburg said no but it looked "real suspicious."  He asked defendant "if he had anything illegal in his [pickup] truck."  When defendant said no, Lindburg "asked him if he would mind if [he] made sure."  The prosecutor questioned Lindburg as follows:

"Q.  [W]hat [were] his words[,] then[,] on the consent ***?

A.  He just said he didn't mind if I searched it [(the truck)].

     Q.  I note you made a gesture there as you testified[.]  [D]id he make any gesture as he answered you?

A.  I believe he shrugged and said he didn't mind if I did."

As Lindburg searched the truck, defendant reached under the seat, pulled out some videocassette folders, and stuck them in his back pocket.  Lindburg told him he "didn't want him to reach under the seat" again.

In the truck, Lindburg found marijuana and a pipe for smoking it.  He handcuffed defendant, read him his 
Miranda
 rights (
Miranda v. Arizona
, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), and put him in the front seat of the patrol car.  By then, Hast had returned and was assisting in the search.  Under the seat, they found two videotapes.  Defense counsel asked Lindburg the following:

"Q.  At the location of the search, did you have any conversation with *** [d]efenda­nt about the tapes?

A.  Yes, I asked him if anything illegal [was on them], pornography or child pornography.

Q.  How did he respond?

A.  There were tapes of him and his girlfriend on there.  There may be some pornography."

Lindburg testified he called Mercer County State's Attorney Baron Heintz on a cellular telephone and asked him, within earshot of defendant, if he could legally view the videotapes.  Heintz told him he could if defendant consented.  Lindburg then asked defendant--who was then sitting in the patrol car with his hands cuffed in front of him--"if he minded if [they] took a look at the tapes.  ***  That is when he gave the shrug."  Defense counsel asked Lindburg:

"Q.  And why were the videotapes seized at that point?

A.  Because I asked [defendant] if he would mind if I took a look at the tape.  He didn't object.

Q.  What did he say?

A.  Nothing, shrugged his shoulders."

After gathering up the evidence, Lindburg took defendant to the Mercer County jail.  "We entered through the sally port and took him to the jailers [and] told them he was under arrest for possession of cannabis and paraphernalia."  Then Lindburg got the videotapes out of his patrol car and brought them into the jail.  A county employee helped him hook up some audiovisual equipment in the dispatcher's office, next door to the room where the jailers were booking defendant.  Between the booking room and the dispatcher's office, there was a window, through which defendant could see Lindburg and others carrying the audiovisual equipment into the office.  

In the dispatcher's office, the police viewed the first videotape, which had footage of the teenager in the parking lot but no pornography.  Defense counsel asked Lindburg:

"Q.  At any time prior to [your] viewing that particular tape [(the first videotape that had no incriminating footage),] did [defendant] verbalize, say [']go ahead and watch the tape['?]  Did he say anything to indicate consent?

A.  He never said [']go ahead and watch the tapes.[']"

Lindburg further testified:

"A.  He was in jail.  We had previously already told him we were taking [the videotapes] to view them[,] however.

* * *

Q.  You said [']we['] had advised him?

A.  I had advised him."

After Lindburg viewed the first videotape, defendant told the jailer he wanted to speak with Lindburg "in the back of the jail."  Lindburg testified:

"A.  I went back there to talk to him.

Q.  And what did he say?

A.  He said that he didn't want a lot of people viewing that tape.  If I needed to use his video camcorder to view the tape, he would show me how to do that.

Q.  Did you utilize the video camcorder?

A.  I told him we had already had it hooked up and only me and the guy who hooked it up [would view the videotape] because there wasn't going to be a lot of people looking at it[,] anyway.

Q.  What did he say after that?

A.  He said [']okay.[']

Q.  And what did you say?

A.  We got in [a] discussion about the fact he knew what he was doing was wrong and that he needed help."

Lindburg then viewed the second videotape, which contained the child pornography that counts I and II describe.  Afterward, he and an investigator interviewed defendant, eliciting from him the admission that he had made the incriminating videotape.

In its order denying the motion to suppress, the trial court noted that defendant was "[34] years old, a college graduate, and working as a scientist."  The order further stated:

"The evidence is somewhat vague as to whether there was an actual verbal consent to the viewing of the tapes by *** [d]efendant at the time they were seized from the car, or mere acquiescence.  It is clear that by *** [d]efendant's body language, the officer thought he had given consent[] and that[,] further[,] *** [d]efendant did not voice any objection to the viewing of the tapes at any time.

* * *

*** [P]rior to the viewing of the tape containing evidence of child pornography, *** [d]efendant took an affirmative act indicative of his voluntary consent by offering his video camera for the officers to use in viewing the tape, saying he didn't want others to see it.  This act, coupled with the original implied consent, even if verbal consent was not clearly given, in light of his age, education, intelligence, non[]coercive setting[,] and all relevant circumstances, leads the [c]ourt to conclude that he voluntarily consented to the viewing of the tape."  

This appeal followed.

II. ANALYSIS

A. Timeliness of the Posttrial Motion

The State argues that because defendant filed his posttrial motion late, he has forfeited the issue of whether he consented to the viewing of the videotape.  His posttrial motion discussed the issue, but he filed the motion on May 3, 2000, more than 30 days after March 22, 2000, when the trial court issued its order finding him guilty of child pornography and residential burglary.  See 725 ILCS 5/116-1(b) (West 2000); 
People v. Segoviano
, 189 Ill. 2d 228, 243, 725 N.E.2d 1275, 1282 (2000).  

Citing our decision in 
People v. Gauwitz
, 80 Ill. App. 3d 362, 400 N.E.2d 92 (1980), defendant argues that because the State never moved to strike the posttrial motion in trial court, the State has waived the issue of untimeliness.  Defendant is correct.  On June 27, 2000, in the hearing on the posttrial motion, the prosecutor never argued that the motion was untimely.  He merely requested that the trial court deny the motion on substantive grounds.  As we said in 
Gauwitz
, 80 Ill. App. 3d at 367, 400 N.E.2d at 96, waiver is a "two-way street."  If the State never alerted the trial court to the untimeliness of the posttrial motion but instead attacked the substantive merits of the motion, the State necessarily recognized the trial court's jurisdiction and waived the issue of untimeliness.  See 
Gauwitz
, 80 Ill. App. 3d at 367, 400 N.E.2d at 96; see also 
People v. Eddington
, 129 Ill. App. 3d 745, 751, 473 N.E.2d 103, 108 (1984) (by actively participating, without objection, in proceedings on a late posttrial motion, the State revested the trial court with jurisdiction).

B. Distinction Between a Search and a Seizure

While giving deference to a trial court's findings of historical fact and reasonable inferences from those facts, we review 
de
 
novo
 the reasonableness of a warrantless search or seizure and, therefore, the applicability of exceptions to the requirement of a warrant.  
People v. Blair
, 321 Ill. App. 3d 373, 748 N.E.2d 318 (2001), 
appeal
 
denied
, 195 Ill. 2d 582, 755 N.E.2d 479 (2001).  The parties do not dispute the historical facts in this case, although they dispute whether defendant voluntarily consented to the viewing of the videotape.

The state and federal constitutions protect the people from unreasonable searches and seizures.  1970 Ill. Const., art. I, §6; U.S. Const., amend. IV.  Absent consent or a warrant, the police must have probable cause to seize property.  
Blair
, 321 Ill. App. 3d at 377, 748 N.E.2d at 323.  The government cannot use unlawfully seized evidence against a defendant at trial.  
City of Chicago v. Lord
, 7 Ill. 2d 379, 381, 130 N.E.2d 504, 505 (1955).

A search and a seizure are conceptually distinct.  The fourth amendment "'protects two types of expectations, one involving "searches," the other "seizures."'"  
Soldal v. Cook County, Illinois
, 506 U.S. 56, 63, 121 L. Ed. 2d 450, 459, 113 S. Ct. 538, 544 (1992), quoting 
United States v. Jacobsen
, 466 U.S. 109, 113, 80 L. Ed. 2d 85, 94, 104 S. Ct. 1652, 1656 (1984).  To "search" means to look for that which is concealed (
People v. Milligan
, 107 Ill. App. 2d 58, 62, 245 N.E.2d 551, 554 (1969)), thereby infringing upon someone's expectation of privacy (
Soldal
, 506 U.S. at 63, 121 L. Ed. 2d at 459, 113 S. Ct. at 544).  To "seize" property means to infringe, in a "meaningful" way, upon someone's possessory interest in the property.  
People v. Shapiro
, 177 Ill. 2d 519, 525-26, 687 N.E.2d 65, 69 (1997).  One can search property without seizing it and seize property without searching it.  
Soldal
, 506 U.S. at 63-64, 121 L. Ed. 2d at 459-60, 113 S. Ct. at 544.  
A consent to search property is not a consent to seize property.  
Blair
, 321 Ill. App. 3d at 378, 748 N.E.2d at 323.

In 
Blair
, 321 Ill. App. 3d at 375, 748 N.E.2d at 322, the police arrested the defendant for disorderly conduct in that he had videotaped children at the zoo.  While the defendant was in custody, the police went to the defendant's residence and, according to their testimony, obtained a consent from his father to search the defendant's computer.  
Blair
, 321 Ill. App. 3d at 375-77, 748 N.E.2d at 322-23.  The police turned on the computer and found "bookmarks" therein with references to teenagers.  
Blair
, 321 Ill. App. 3d at 376, 748 N.E.2d at 322.  Believing it contained child pornography, the police seized the computer and, upon performing a more thorough search of it outside the home, found child pornography in the computer.  
Blair
, 321 Ill. App. 3d at 376, 748 N.E.2d at 322.  The Third District held:  "[E]ven assuming that the search of defendant's computer was lawful, the computer could not be seized absent valid consent to seize it" (
Blair
, 321 Ill. App. 3d at 378, 748 N.E.2d at 323) or probable cause (
Blair
, 321 Ill. App. 3d at 377, 748 N.E.2d at 323).  The defendant's videotaping children at the zoo and the "bookmarks" referencing teenagers would have aroused suspicion in a reasonable person but would not have given probable cause to believe the computer contained child pornography.  
Blair
, 321 Ill. App. 3d at 377-78, 748 N.E.2d at 323.  Thus, the trial court erred in denying the motion to suppress the computer files.  
Blair
, 321 Ill. App. 3d at 375, 748 N.E.2d at 321.

Defendant argues that a reasonable person, when consenting to a search of a pickup truck, would not "anticipate that the [police] officer would carry off *** videotapes in order to play them at an off-site location."  He argues that his consent to search the truck did not encompass the police officer's "removing the videotapes from the truck and viewing them at a remote location."  We agree.  By carrying away the videotapes to the county jail and viewing them in a separate room while defendant was being booked, the police interfered, in a meaningful way, with defendant's possessory interest in the videotapes.  They seized the videotapes, and by consenting to a search of his pickup truck, defendant had not consented to a seizure of any property.  

If police discover an item during a lawful search (such as a search pursuant to consent), they may seize it only if they have probable cause to believe it is contraband or evidence of a crime.  
Warden, Maryland Penitentiary v. Hayden
, 387 U.S. 294, 307, 18 L. Ed. 2d 782, 792, 87 S. Ct. 1642, 1650 (1967); 
Blair
, 321 Ill. App. 3d at 377, 748 N.E.2d at 323.  The incriminating character of the item must be immediately apparent at the time of the seizure.  
Blair
, 321 Ill. App. 3d at 377, 748 N.E.2d at 323; 
Horton v. California
, 496 U.S. 128, 136, 110 L. Ed. 2d 112, 123, 110 S. Ct. 2301, 2308 (1990).  "[I]f the 
Hayden
 test is not met, then objects lawfully discovered in the consent search may not be carried off and subjected to further scrutiny, unless of course the consent goes so far."  3 W. LaFave, Search & Seizure §8.1(c), at 624 (3d ed. 1996).  If the facts underlying a claim of probable cause are undisputed, we review probable cause 
de
 
novo
.  
People v. Sweborg
, 293 Ill. App. 3d 298, 301, 688 N.E.2d 144, 146 (1997).  A person's possession of nonpornographic images of children does not create probable cause to seize that person's property in the belief that it might contain child pornography.  
Blair
, 321 Ill. App. 3d at 377-78, 748 N.E.2d at 323; 
United States v. Brunette
, 256 F.3d 14, 17 (1st Cir. 2001); 
United States v. Hernandez
, 183 F. Supp. 2d 468, 476 (D.P.R. 2002).  The police lacked probable cause to seize defendant's videotapes.

C. The Shrug

At the site of the search, while defendant sat handcuff­ed in the patrol car, Lindburg asked him if "he would mind if [he] took a look at the tape."  Defendant's only response was a shrug. 

We determine the scope of consent by applying a standard of "'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  
Florida v. Jimeno
, 500 U.S. 248, 251, 114 L. Ed. 2d 297, 302, 111 S. Ct. 1801, 1803-04 (1991).  Even though Lindburg did not phrase his request to "take a look at" the videotapes as a request to seize them, a reasonable person, in defendant's position, would have understood Lindburg as requesting permission to view the videotapes at the jail and, therefore, to seize them.  Defendant knew the police were going to take him to the jail and could not have reasonably expected them to view the two videotapes, from start to finish, on his own camcorder, at the site of the arrest.  

Defendant's shrug was not an unambiguous expression of consent.  In 
People v. Anthony
, 198 Ill. 2d 194, 197-98, 761 N.E.2d 1188, 1190 (2001), a police officer approached the defendant on the street and, after asking him what he was doing in the area and whether he had anything illegal on his person, requested him to consent to a search of his person.  Plainly nervous, his hands shaking, the defendant gave no verbal consent but merely "'assumed the position'" for a pat-down, spreading his legs apart and placing his hands on top of his head.  
Anthony
, 198 Ill. 2d at 198, 761 N.E.2d at 1190.  The police officer construed that gesture as a "nonverbal consent," searched him, and found cocaine.  
Anthony
, 198 Ill. 2d at 198-99, 761 N.E.2d at 1190.  According to the supreme court, the State failed to prove that the defendant had voluntarily consented to the search.  
Anthony
, 198 Ill. 2d at 203-04, 761 N.E.2d at 1193.

The supreme court explained:

"The defendant may convey consent to search by nonverbal conduct [citations], but 'mere acquiescence to apparent authority is not  necessarily consent' [citation].  ***

***

The State would have us draw an inference *** that the defendant intended to consent, not to acquiesce.  An equally valid inference from the defendant's ambiguous  gesture is that he submitted and surrendered to what he viewed as the intimidating presence of an armed and uniformed police officer who had just asked a series of subtly and increasingly accusatory questions."  
Anthony
, 198 Ill. 2d at 202-03, 761 N.E.2d at 1192-93, quoting 
People v. Kelly
, 76 Ill. App. 3d 80, 87, 394 N.E.2d 739, 744 (1979).

In the present case, defendant's shrug was more ambiguous than the defendant's "assuming the position" in 
Anthony
.  A shrug can express "aloofness, indifference, or uncertainty."  Merriam-Webster's Collegiate Dictionary 1084 (10th ed. 2000).  "In the case of nonverbal conduct, where dueling inferences so easily arise from a single ambiguous gesture, the defendant's intention to surrender this valuable constitutional right should be unmistakably clear."  
Anthony
, 198 Ill. 2d at 203, 761 N.E.2d at 1193.  The State has the burden of proving the consent was voluntary.  
Anthony
, 198 Ill. 2d at 202, 761 N.E.2d at 1192.  The State cannot carry that burden by proving that defendant shrugg­ed.  See 
State v. Zapp
, 108 Idaho 723, 726, 701 P.2d 671, 674    (App. 1985) (shrugging shoulders and holding up a bag were not sufficient gestures of consent to search the bag); 
State v. Harris
, 642 A.2d 1242, 1246-47 (Del. Super. 1993) (shrugging shoulders was not a sufficient gesture of consent to search a toolbox).

The shrug could have meant "I don't know."  It could have expressed aloofness--or contempt.  It could have expressed defendant's acquiescence to authority after the police asked him a series of increasingly accusatory questions (Why were you videotaping that young woman?  Do you have anything illegal in this truck?  Is there any child pornography on this videotape?).  According to our supreme court, defendant's consent to the seizure and viewing of the videotape had to be "unmistakably clear" from the shrug or any other "nonverbal conduct."  
Anthony
, 198 Ill. 2d at 203, 761 N.E.2d at 1193.  Significantly, the trial court found it was 
unclear
 whether the shrug was a manifestation of consent or a mere acquiescence to authority:  "The evidence is somewhat vague as to whether there was an actual verbal consent to the viewing of the tapes by *** [d]efendant at the time they were seized from the car, 
or
 
mere
 
acquiescence
."  (Emphasis added.)  Thus, the trial court, in its fact-finding capacity, found the shrug 
not
 to be an "unmistakably clear" manifestation of consent.   

Even if the shrug expressed indifference, it still would have been ambiguous, because it could have expressed indifference not to the proposed seizure of the videotapes but to the 
request
 to seize them (as if to say, "What does it matter if I consent or not?  You're going to take the videotapes and view them, anyway.").  Defendant had shrugged when 
verbally
 consenting to the search of his truck, but defendant's 
mute
 shrug, when he was handcuffed in the patrol car, could have had a different meaning.

The State points out that "defendant never protested upon learning that Lindburg interpreted his 'shrug' as consent."  In 
Anthony
, we used the same reasoning in a Rule 23 order, which the supreme court reversed.  We said:  "'Defendant never protested during [the police officer's] search or otherwise objected to the search.  By these actions, defendant gave his consent to [the police officer] for the search.'"  
Anthony
, 198 Ill. 2d at 200, 761 N.E.2d at 1191, quoting 
People v. Anthony
, No. 4-99-0708, slip order at 7-8 (June 22, 2000) (unpublished order under Supreme Court Rule 23).  The supreme court declined to hold that the lack of an objection, coupled with an ambiguous gesture, was an affirmative consent.  Treating the lack of an objection as a consent would greatly debase the concept of consent.  It was not defendant's responsibility to protest an illegal search or seizure; it was the police's responsibility to refrain from a search or seizure until defendant gave his clear, voluntary consent.

D. Defendant's Offer To Use His Camcorder

In the county jail, defendant clearly and explicitly offered to show the videotapes on his camcorder.  The trial court inferred that defendant did so voluntarily, and the State argues we should defer to that finding.  Because the voluntariness of consent is a factual question, we will uphold the trial court's finding of voluntariness unless the finding is manifestly erroneous.  
People v. Purchase
, 214 Ill. App. 3d 152, 155, 573 N.E.2d 831, 834 (1991).  "Manifest error" means error that is "clearly evident, plain, and indisputable."  
People v. Ruiz
, 177 Ill. 2d 368, 384-85, 686 N.E.2d 574, 582 (1997).

The trial court's own words belie its finding of voluntariness.  If, as the trial court said, defendant offered the use of his camcorder because "he didn't want others to see [the videotape]," it is clear that his consent was not the product of his unconstrained, free will.  Once defendant was in jail, the viewing of the videotape appeared to be a 
fait
 
accompli
:  the police had told him they were going to view it, and he saw them carrying in the audiovisual equipment.  The State admits that defendant's purpose, in offering the use of his camcorder, was to "limit[] the number of people who saw the tape."  We think it is unreasonable to infer that just because defendant did not want a lot of people viewing the videotape, he 
wanted
 Lindburg to view the videotape.  Defendant's offer obviously was "damage-control."  In 
Anthony
, 198 Ill. 2d at 203, 761 N.E.2d at 1193, the supreme court said that a suspect's statement to the police to "'[d]o what you have to do'" was not a voluntary consent to a search.  In defendant's case, we might alter the statement only slightly, as follows:  "If you have to view the remaining videotape, do so in a way that preserves a vestige of my privacy."  That is not a statement of voluntary consent.

The State characterizes defendant as intelligent and well-educated and, therefore, not the type of person the police could manipulate.  More precisely, he is an aquatic biologist and has published scientific papers.  "In determining whether a defendant's will was over-borne in a particular case, the Court has assessed the totality of the circumstances," including the defendant's "lack of education *** or *** low intelligence."  
Schneckloth v. Bustamonte
, 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047 (1973).  Perhaps, by and large, a worldly, intelligent, learned person is less vulnerable to suggestion or coercion than a simple, illiterate person.  We must not entertain unrealistic expectations, however, of a degree in aquatic biology.  Defendant's education and accomplishments were in a narrow, specialized field, which would not necessarily well-equip him for an encounter with the police.  

The police had advised defendant of his right to remain silent (and, therefore, his right to refrain from proposing that Lindburg use his camcorder).  Whether the police gave the defendant a 
Miranda
 warning is a factor to consider when deciding whether the defendant's consent was voluntary.  
People v. Smith
, 124 Ill. App. 3d 914, 921, 464 N.E.2d 1206, 1212 (1984).  Nevertheless, defendant apparently concluded that his silence, at that point, would have done him no good but, rather, would have brought him greater humiliation, because the police had resolved to view the videotapes and had in fact already viewed the first one.   

Even if we assumed, for the sake of argument, that the consent defendant gave in the jail was voluntary, the consent would nevertheless be ineffective because it was "'inextricably bound up with [the State's] illegal conduct and [could not] be segregated therefrom.'"  
People v. Freeman
, 121 Ill. App. 3d 1023, 1032, 460 N.E.2d 125, 131 (1984), quoting 
Kelly
, 76 Ill. App. 3d at 86, 394 N.E.2d at 744.  Because defendant's shrug was not a clear communication of consent to seize the videotapes, the seizure of them was unreasonable.  Defendant's offer to use his camcorder was inextricably bound up with the seizure of the videotapes.  If the police had not seized the videotapes and viewed the first one (after stating an intent to view them both), defendant would not have offered the use of his camcorder--voluntarily or otherwise.   

III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and defendant's conviction on all four counts.

Reversed.

KNECHT, J., concurs.

MYERSCOUGH, P.J., specially concurs in part and dissents in part.

PRESIDING JUSTICE MYERSCOUGH, specially concurring in part and dissenting in part:

I concur that the State forfeited the issue of untimeliness of the posttrial motion.  However, I disagree with the majority's holding that defendant did not consent to the search or the viewing of the videotapes.  I disagree also with the majority's apparent view that appellate courts should always review 
de
 
novo
 the voluntariness of a consent.  Voluntariness of a consent is only reviewed 
de
 
novo
 where neither the facts nor the credibility of witnesses is disputed.  
Anthony
, 198 Ill. 2d at 201, 761 N.E.2d at 1191; see also 
People v. Sims
, 192 Ill. 2d 592, 615, 736 N.E.2d 1048, 1060 (2000), citing 
Ornelas v. United States
, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996); 
People v. Carlson
, 185 Ill. 2d 546, 551, 708 N.E.2d 372, 374 (1999).

Perhaps, the majority's finding that neither the facts 

nor the credibility of witnesses is disputed is based on the trial court's comment that "[i]t is clear that by *** [d]efendant's body language, the officer thought he [defendant] had given consent[] and that[,] further[,] [d]efendant did not voice any objection to the viewing of the tapes at any time."  Slip op. at 9.  However, I find that the trial court's findings--that (1) Lindburg believed that defendant had voluntarily consented, (2) defendant voiced no objection to the viewing of the tape, and (3) defendant's lack of objection constituted consent--were credibility findings, which should not be disturbed absent an abuse of discretion.

Regardless, even under the 
de
 
novo
 standard, I would affirm the trial court.  The record indicates that defendant voluntarily consented to a search of his car.  Defendant was 34 years of age, a college graduate employed as a scientist at the time of this incident.  When defendant consented, he was not under arrest or in any way detained.  Lindburg did not have his weapon drawn, nor had he activated his squad emergency lights.  No evidence suggests that Lindburg had made any threats or that his language used or the tone of voice was in any way coercive.  The consent was clearly voluntary.  
United States v. Kozinski
, 16 F.3d 795, 810 (7th Cir. 1994).

Moreover, Lindburg did not exceed the scope of that consent.  The scope of consent is not determined by the subjective intentions of the consenting party or the subjective interpretation of the searching officer.  
People v. Baltazar
, 295 Ill. App. 3d 146, 149, 691 N.E.2d 1186, 1189 (1998).  Rather, the standard for measuring the scope of a suspect's consent is that of "objective reasonableness."  
Jimeno
, 500 U.S. at 251, 114 L. Ed. 2d at 302, 111 S. Ct. at 1803; 
People v. Ledesma
, 327 Ill. App. 3d 805, 814, 763 N.E.2d 806, 814 (2002).  This requires consideration of what a typical, reasonable person would have understood by the exchange between the officer and the suspect.  
Jimeno
, 500 U.S. at 251, 114 L. Ed. 2d at 302, 111 S. Ct. at 1803-1804; 
Baltazer
, 295 Ill. App. 3d at 149-50, 691 N.E.2d at 1189.  The scope of a search is generally defined by its express object.  
Jimeno
, 500 U.S. at 251, 114 L. Ed. 2d at 303, 111 S. Ct. at 1804.  Consequently, the scope of a search may ordinarily be ascertained by evaluating the officer's express focus or purpose of the search.  
Ledesma
, 327 Ill. App. 3d at 814, 763 N.E.2d at 815.  In other words, courts examine what the police said was the reason for the search.  
Ledesma
, 327 Ill. App. 3d at 814, 763 N.E.2d at 815.

In the instant case, defendant was seen at Wal-Mart videotaping a 17-year-old girl.  He then returned to Wal-Mart and overheard Officer Lindburg investigating defendant's videotaping of the girl.  Defendant fled at a high rate of speed and was stopped by another officer.  Lindburg, concerned a stalking of the girl was occurring, then questioned defendant about the videotaping and whether he had any pornography.  Clearly, the focus of Lindburg's search was to determine whether defendant was a stalker and whether he possessed illegal pornography.  

Lindburg expressly asked about defendant's videotaping of the Wal-Mart employee.  Lindburg asked defendant why he was videotaping a Wal-Mart employee.  He then asked defendant whether defendant had anything illegal in the vehicle, and defendant replied that he did not.  Lindburg asked if he could make sure, and defendant said that was fine.  Since the focus of a search defines its scope, defendant's consent extended to a viewing of the videotape.  

Under those circumstances, a reasonable person would expect that the videotapes could be viewed as part of the search, since they could contain evidence directly relating to defendant's suspicious activities.  See 
People v. Berry
, 314 Ill. App. 3d 1, 15, 731 N.E.2d 853, 865 (2000) (reasonable person would have understood exchange in which defendant said, "'Go right ahead,'" in response to officer's request to look at phone, to mean that defendant consented to officer turning on phone and pulling up number, where only subject under discussion was defendant's ownership of phone).  See also 
People v. Kelk
, 231 Ill. App. 3d 797, 800-01, 596 N.E.2d 1267, 1269 (1992), where this court stated:

"Here, the police officer asked the defendant, immediately prior to his request to 'look in the car,' if there were any drugs or weapons in the vehicle.  The context of that question sufficiently informed the suspect of what the officer intended to do, and, under those circumstances, the officer would reasonably consider the defendant's statement--that he did not care if the officer looked in his car--to be a general consent to a search of that car, including contents thereof, as the Supreme Court held in 
Jimeno
."  

The videotapes, one labeled "Aledo Girls," camera, video camera, pornographic magazine, women's undergarments, and lingerie found here were clearly within that focus.

Additionally, Lindburg was entitled to continue his search on two other grounds.  Immediately after commencing the search, the officer discovered the cannabis and drug paraphernalia.  At that time, defendant was placed under arrest and properly advised of his 
Miranda
 rights.  The continuation of the search resulted in the seizure of the videotapes and female lingerie.  Defendant's contention that even if the court finds the search to be consensual, anything seized after the finding of the cannabis and paraphernalia should be suppressed is without merit for two reasons.  

Once a defendant voluntarily consents to a search of an area, in this case, his car, he cannot thereafter complain that a search of the area exceeded the scope of his consent, unless he clearly protests or withdrew that consent.  
Jimeno
, 500 U.S. at 251, 114 L. Ed. 2d at 303, 111 S. Ct. at 1804; 
United States v. Stribling
, 94 F.3d 321, 324 (7th Cir. 1996).  Under 
Chimel v. California
, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969), once the marijuana and paraphernalia were found, the officer clearly had the authority to complete the search incident to the arrest even without the defendant's consent, and the scope of the search extended to all areas where the seized items were discovered.  
New York v. Belton
, 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860 (1981); 
United States v. Richardson
, 121 F.3d 1051 (7th Cir. 1997).  Given this authority, the officer did not need to seek further consent, and neither the fact that he did nor defendant's later responses detract from that authority.

Moreover, given this authority, defendant's shrug in response to Lindburg's request to view the videotapes further ratified Lindburg's authority to do so.  Defendant could not, after his arrest, reasonably expect that Lindburg would view the tapes roadside--with an arrested suspect--rather than take the tapes to the station to view them.

Finally, prior to Lindburg viewing the second tape, which contained the child pornography, defendant clearly consented to viewing the second tape and did not withdraw his prior consent.  Rather, defendant took an affirmative act indicative of his voluntary consent by offering Lindburg his video camera to use to view the tape, saying he did not want others to see it.  This act, coupled with the original consent and the later shrug, in light of his age, education, intelligence, setting, and all relevant circumstances, indicate defendant voluntarily consented to the viewing of the tape.  Were the defendant a 17-year-old uneducated individual, or had he in any way indicated an objection to the viewing of the tape at any time, my conclusion might be otherwise.  
United States v. Price
, 54 F.3d 342 (7th Cir. 1995); 
United States v. Gutierrez-Moran
, 125 F.3d 863 (10th Cir. 1997) (unpublished disposition).

For these reasons, I would affirm the trial court.