THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. SUSAN LYNN GOTT *et al.*, Defendants-Appellees.

Fifth District    No. 5—02—0580

Opinion filed December 18, 2003.—Motion to publish granted January 21, 2004.

WELCH, J., dissenting.

Steven Friedel, State's Attorney, of Vandalia (Norbert J. Goetten, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Nancy L. Vincent, both of State Appellate Defender's Office, of Springfield, for appellee Susan Lynn Gott.

D. Peter Wise and Todd M. Goebel, both of Gates, Wise & Schlosser, P.C., of Springfield, for appellee Clyde Murrel Gott, Jr.

JUSTICE DONOVAN delivered the opinion of the court:

Defendants Susan Gott and Clyde Gott were charged with one count of unlawful manufacture of a controlled substance that consisted of more than 400 grams but less than 900 grams of methamphetamine in violation of section 401(a)(6.5)(C) of the Illinois Controlled Substances Act (Act) (720 ILCS 570/401(a)(6.5)(C) (West 2000)) and with a second count of unlawful manufacture of a controlled substance that consisted of more than 900 grams of a substance containing methamphetamine in violation of section 401(a)(6.5)(D) of the Act (720 ILCS 570/401(a)(6.5)(D) (West 2000)). Defendants moved to suppress the drugs seized, arguing that they had been obtained during a

warrantless search without probable cause or exigent circumstances. The trial court granted defendants' motion. The State now appeals the Fayette County circuit court's decision granting defendants' motion to suppress. For the following reasons, we affirm.

## BACKGROUND

On January 18, 2002, Dennis Ramsey, the owner of Okaw Valley Campground in Fayette County, Illinois, rented a cabin to Susan Gott. The cabin is approximately 10 feet by 10 feet, with a window on each side of the cabin, a small window on the front of the cabin, a small porch, and its own parking area, fire pit, and grill. The grill is located a few feet from the front of the cabin door. Inside the cabin, there is a bed on one side and bunk beds on the other side. The cabin does not have toilet facilities or running water. The checkout time of 11 a.m. was posted inside the cabin.

On January 19, 2002, sometime around 1 p.m., Mr. Ramsey noticed that the cabin was still occupied. Around 2 p.m., Mr. Ramsey saw that defendants' car was gone and approached the cabin to see if it was still occupied. He knocked on the door, and Susan's husband, Clyde, opened the door a "slit," exited, and quickly shut the door behind him. Clyde told Mr. Ramsey that he and Susan intended to stay and that Susan had gone to town to obtain money for the additional night. Mr. Ramsey instructed Clyde to put the money in the night deposit box.

Growing suspicious because Susan and Clyde had not yet paid for the additional night and their car was not there, Mr. Ramsey called the sheriff's department around 3 p.m. Deputy Gary Washburn responded to Mr. Ramsey's request for assistance. He walked around the cabin and knocked on the door. Deputy Washburn saw a plastic Wal-Mart bag with a small pitcher in it on the porch of the cabin and a burnt blister pack in the grill. On the blister pack he could make out a part of the word "ephedrine." The grill was not warm, but there was also no snow on the blister pack. He also noticed an unusual chemical odor.

Mr. Ramsey asked Deputy Washburn to look in the cabin. Deputy Washburn had reservations about doing this, so he contacted the State's Attorney, who instructed him not to accompany Mr. Ramsey on a search of the cabin and, instead, recommended surveillance. Deputy Washburn acknowledged that up to that point he knew he needed more information before he could proceed further. Based on Deputy Washburn's suspicion of a methamphetamine lab, Deputy Washburn told Mr. Ramsey that although he could not search the cabin, Mr. Ramsey could. Deputy Washburn and Mr. Ramsey then had a discus-

sion about methamphetamine labs, and Deputy Washburn showed Mr. Ramsey law enforcement materials on the topic, complete with photos and descriptions of paraphernalia sometimes found in locations where methamphetamine is being produced.

Mr. Ramsey entered the cabin while Deputy Washburn remained in the campground office. Mr. Ramsey returned and reported to Deputy Washburn that he had seen a handgun with pellets next to it, a hunting knife, rock salt, drain opener, and a cooler and that he had noted a chemical odor. Mr. Ramsey agreed to allow the police to conduct surveillance from his property. Deputy Washburn left the campground at roughly 3 or 4 p.m. to prepare.

Deputy Washburn contacted Deputy Lay, Deputy Halleman, and Trooper Smith for assistance in investigating defendants' cabin. Around 6 p.m., Deputy Washburn and Deputy Lay went to the campground and proceeded to conduct surveillance from a second-floor room above the campground office with a view of the cabin. The officers noticed that there was now a vehicle outside the cabin. Trooper Smith and Deputy Halleman waited at a nearby truck stop for further directions.

Susan left the cabin sometime after 6 p.m. driving an older model Crown Victoria. Deputy Halleman followed Susan to a gas station and convenience store. He lost track of her, but it was not because she was in any way attempting to elude him. Susan returned around 6:45 p.m., dropped something off in the night deposit box, and went into the cabin.

Susan left again around 7:30 p.m. Deputy Halleman followed her to a different convenience store. Again, she showed no sign of knowing that she had been followed. She returned to the cabin around 8 p.m. Shortly thereafter, Deputy Halleman and Trooper Smith drove up to the cabin with their lights off. Deputy Washburn and Deputy Lay moved to within 15 to 20 feet of the cabin to see what was being carried in and to detect any odor from the area. After 8 p.m., Deputy Washburn saw Clyde exit the cabin carrying a clear container and dump clear liquid on the ground. Immediately after he dumped the liquid, there was a strong smell of ether. Based on his experience in several methamphetamine lab investigations, Deputy Washburn was aware of the smell of ether. Deputy Washburn testified that ether is used in the manufacture of methamphetamine. Around this same time, Deputy Lay and Deputy Halleman proceeded to the front door while Trooper Smith and Deputy Washburn waited on the side of the cabin by one of the windows. Deputy Washburn and Trooper Smith could see into the cabin through an opening in the blinds.

Deputy Lay and Deputy Halleman knocked on the door but did

not identify themselves as police. As soon as they knocked, Trooper Smith and Deputy Washburn saw Clyde pick up a glass container, set it inside a thermos, and put a lid on the thermos. They also saw Susan take a container and a bottle and put them under some clothing. From his position, Trooper Smith could not see the shelf where Mr. Ramsey had said the gun was located. Neither defendant made any effort to answer the door. Instead, Clyde turned off the lights. Until Clyde turned off the lights, Trooper Smith had not seen anyone pour anything on the floor or burn or destroy anything. The officers moved to the front door, knocked, and announced "Sheriff's Department," and all four police officers went through the door. Trooper Smith handcuffed Susan, took her outside, and put her in his squad car. Trooper Smith then read Susan her *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) and had no further conversation with her. Deputy Washburn went to the front porch and read Clyde his *Miranda* rights and asked for his consent to search the cabin. After Clyde talked to Susan, he signed a written consent to search the cabin. Upon searching, the officers found, among other things, a pellet handgun, ether cans, lithium battery packs, tubing, a hot glue gun, muriatic acid, drain opener, knives, a needle on a plate, and a substance that was later determined to be methamphetamine.

On January 22, 2002, defendants Clyde and Susan were charged with unlawful manufacture of a controlled substance that consisted of more than 400 grams but less than 900 grams of methamphetamine in violation of section 401(a)(6.5)(C) of the Act (720 ILCS 570/ 401(a)(6.5)(C) (West 2000)). On March 22, 2002, defendants were charged with a second count of unlawful manufacture of a controlled substance that consisted of more than 900 grams of a substance containing methamphetamine in violation of section 401 (a)(6.5)(D) of the Act (720 ILCS 570/401(a)(6.5)(D) (West 2000)). Defendants filed motions to quash the arrest and suppress the evidence obtained. The court held hearings on June 21 and 26, 2002.

On July 29, 2002, the trial court issued its order granting the motion to suppress. The court barred all the evidence seized from the cabin and the subsequent statements as "fruits of the poisonous tree." The trial judge, in his detailed, written, mixed findings of law and fact, drew the following conclusions: Deputy Washburn could rightfully approach the cabin at Mr. Ramsey's request and knock on the door; Deputy Washburn was authorized to observe the Wal-Mart bag outside the defendants' cabin and detect the unknown chemical odor; the blister packs were properly discovered since there had been no effort to protect them from view and they had been discarded; Mr. Ramsey's

search was undertaken as an agent of the police since the police gave Mr. Ramsey a training brochure on what items someone would find on the premises being used for the manufacture of methamphetamine, and, as a result, Mr. Ramsey's search of the cabin was unconstitutional; the court concluded that the officers smelling ether from 25 feet away was neither an exigent circumstance nor probable cause to search the cabin; and even if the pellet gun observed by Mr. Ramsey was considered, it did not create exigent circumstances. Finally, the trial judge concluded that since this was a one-room cabin, without a telephone or plumbing, and with only one road leading in or out, if the pouring of the clear liquid believed to be ether was sufficient to create probable cause, there was no reason why the officers could not have waited outside the cabin while a warrant was obtained.

The State filed a motion to reconsider on August 16, 2002, and on August 26, 2002, the trial court denied the motion. Defendants then moved to dismiss the charges. On August 28, 2002, the State filed its notice of appeal and a certificate of impairment.

## ARGUMENT

■ When arguing a motion to suppress, the defendant has the burden of proving that the search and seizure were unlawful. 725 ILCS 5/114—12(b) (West 2000). The function of the trial court at the hearing on the motion to suppress is to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *People v. Garcia*, 296 Ill. App. 3d 769, 776, 695 N.E.2d 1292, 1297 (1998). "Generally, a trial court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous. This deferential standard applies when the disposition of the suppression motion turns on factual determinations and credibility assessments. Where, however, no dispute exists as to the facts or witness credibility, the trial court's ruling will be reviewed *de novo*." *People v. Bunch*, 207 Ill. 2d 7, 13, 796 N.E.2d 1024, 1028 (2003); see also *People v. Anthony*, 198 Ill. 2d 194, 200-01, 761 N.E.2d 1188, 1191 (2001). In the present case, what occurred is largely undisputed. Accordingly, we conduct a *de novo* review under the officers' version of the events.

■ The fourth amendment to the United States Constitution protects people from unreasonable searches and seizures of their persons, houses, papers, and effects. U.S. Const., amend. IV. This protection extends to protect people from an unreasonable search of their hotel rooms. *People v. Eichelberger*, 91 Ill. 2d 359, 364-65, 438 N.E.2d 140, 142-43 (1982) (residents of a hotel are accorded the same constitutional protections against unreasonable searches as those

enjoyed by residents of private homes in Illinois), citing *People v. Bankhead*, 27 Ill. 2d 18, 23, 187 N.E.2d 705, 707 (1963), and *People v. Wilson*, 86 Ill. App. 3d 637, 640, 408 N.E.2d 988, 991 (1980). The fourth amendment seeks to balance the interests of citizens in being free from unreasonable interferences with privacy and the interests of fair law enforcement in protecting the community. *People v. Abt*, 269 Ill. App. 3d 831, 836, 646 N.E.2d 1341, 1345 (1995). " 'Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.' " *People v. Hilgenberg*, 223 Ill. App. 3d 286, 293-94, 585 N.E.2d 180, 186 (1991), quoting *Payton v. New York*, 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382 (1980).

■ The State bears the burden of demonstrating that exigent circumstances authorized the warrantless entry by the police. *People v. McNeal*, 175 Ill. 2d 335, 345, 677 N.E.2d 841, 846 (1997). The cornerstone of an exigency analysis is whether the police officers acted reasonably. *People v. Williams*, 161 Ill. 2d 1, 26, 641 N.E.2d 296, 306 (1994). Each case is evaluated based upon the totality of the circumstances known to the officers at the time of the warrantless entry. *People v. Yates*, 98 Ill. 2d 502, 515, 456 N.E.2d 1369, 1376 (1983). The State must present evidence of the specific facts available to the police officers that would warrant a person of reasonable caution to believe that the action taken was appropriate. *People v. Washington*, 269 Ill. App. 3d 862, 866, 646 N.E.2d 1268, 1271-72 (1995).

■ Although each case must be decided on its own facts, the Illinois Supreme Court has recognized the following factors as relevant to a determination of exigency in circumstances involving a warrantless entry into a private residence to effectuate an arrest: (1) whether the crime under investigation was recently committed, (2) whether there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained, (3) whether a grave offense was involved, particularly a crime of violence, (4) whether there was reasonable belief that the suspect was armed, (5) whether the police officers were acting on a clear showing of probable cause, (6) whether there was a likelihood that the suspect would escape if he was not swiftly apprehended, (7) whether there was strong reason to believe the suspect was in the premises, and (8) whether the police entry was made peaceably, albeit nonconsensually. *People v. Williams*, 161 Ill. 2d 1, 25-26, 641 N.E.2d 296, 306 (1994), citing *People v. Foskey*, 136 Ill. 2d 66, 75, 554 N.E.2d 192, 197 (1990), *People v. White*, 117 Ill. 2d 194, 216-17, 512 N.E.2d 677, 685 (1987), *People v. Yates*, 98 Ill. 2d 502, 515, 456 N.E.2d 1369, 1376 (1983), and *People v. Abney*, 81 Ill. 2d 159, 169-74, 407 N.E.2d 543, 547-50 (1980). This list of factors is not exhaustive of facts that may constitute exigent circumstances. *Williams*, 161 Ill. 2d at 26, 641 N.E.2d at 306.

■ In support of the first factor, the State argues that an offense was committed in the officers' presence. In Illinois, the commission of an offense in the presence of an officer militates in favor of a finding of exigent circumstances. *Eichelberger*, 91 Ill. 2d at 369, 438 N.E.2d at 144-45 (exigent circumstances to make a warrantless arrest in a suspect's home exist where an offense is committed in the presence of an officer). The testimony showed that when the officers looked into the window of defendants' cabin, they saw defendants moving things around inside. Specifically, Trooper Smith testified:

"ATTORNEY: What happened after the officers started knocking on the door?

TROOPER SMITH: As soon as the officers on the front knocked on the door, I saw a male subject walk over to a glass container— I'm not for sure how big it was, it was at least as big as that pitcher on your desk—pick it up and set it inside of a yellow-like thermos water cooler and put the lid on top of it.

ATTORNEY: What did he do with that?

TROOPER SMITH: What do you mean? With the glass container? He set it inside and put the lid on it so you couldn't see the glass container again.

ATTORNEY: How many people did you see in this cabin?

TROOPER SMITH: Then I saw a female in the cabin walk over to—it was a container—I'm not for sure what it was or what was in it, and there was a bottle and I'm not for sure what was in it either. She took it to the window area where I was and tried to put it underneath some clothing and stuff, but I pulled my head back because I didn't want to be seen."

Similarly, Deputy Washburn testified to the following:

"ATTORNEY: From your position you saw people inside, right?

DEPUTY WASHBURN: Yes.

ATTORNEY: You were peering through this crack?

DEPUTY WASHBURN: Correct.

ATTORNEY: You could see people moving things around?

DEPUTY WASHBURN: Correct.

ATTORNEY: Nobody was burning anything?

DEPUTY WASHBURN: No.

ATTORNEY: Destroying anything?

DEPUTY WASHBURN: I didn't know at that point.

ATTORNEY: You saw them simply moving things, right?

DEPUTY WASHBURN: I saw a container being placed inside another container, items being jostled around and hid."

There was no testimony that the officers witnessed defendants in the process of manufacturing methamphetamine. The observations of the officers through the slits in the blinds of the cabin windows do not

support the contention that the active manufacture of methamphetamine was taking place in their presence.

Regarding the second factor, the State contends that there was no deliberate or unjustified delay by the officers during which time they could have obtained a search warrant. The State recognizes that Mr. Ramsey was acting as a police agent when he entered the cabin earlier in the day and observed items normally used in the production of methamphetamine. See *People v. Barber*, 94 Ill. App. 3d 813, 815, 419 N.E.2d 71, 72-73 (1981) (landlord acted as an agent of the police in entering an apartment at their request). As a result, the information Mr. Ramsey acquired was in violation of the constitution and could not be used in determining probable cause. Consequently, the State is correct in concluding that if probable cause existed, it would have to be based on Deputy Washburn's earlier observations, the smell of ether, and the information obtained by peering into the cabin immediately prior to the forced entry. The delay in obtaining a warrant in this case would not preclude a finding of exigent circumstances.

Regarding the third factor, we note that when evidence of the serious potential hazards connected with the manufacture of methamphetamine are presented to the trial court, some courts have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an *ongoing* methamphetamine manufacturing operation. See *United States v. Wilson*, 865 F.2d 215, 217 (9th Cir. 1989); *United States v. Echegoyen*, 799 F.2d 1271, 1278-79 (9th Cir. 1986); *United States v. Brock*, 667 F.2d 1311, 1318 (9th Cir. 1982); *United States v. Erb*, 596 F.2d 412, 418 (10th Cir. 1979). However, in each of these cases, evidence was presented that the officers were aware of the dangers of methamphetamine production. See *Wilson*, 865 F.2d at 216-17 (officer knew that ether is highly explosive and flammable); *Echegoyen*, 799 F.2d at 1274 (officers were aware that home was a fire hazard); *Brock*, 667 F.2d at 1314-15 (the smell of cooking methamphetamine and the officer's observation of the defendant choking on fumes supported the officer's fears of a potential explosion and justified a warrantless entry into the mobile home); *Erb*, 596 F.2d at 417-18 (the strong smell of ether emanating from the house for more than six hours, reliable tips from an informant, the officer's fear that the defendant might try to destroy evidence, and the fact a methamphetamine lab could cause danger to the public established exigent circumstances allowing a warrantless entry of dwelling); see also *United Sates v. Rhiger*, 315 F.3d 1283 (10th Cir. 2003) (the record provided ample evidence regarding the inherent volatility of a methamphetamine lab and of the agents' reasonable belief of its existence in the residence); *United States v. Walsh*, 299 F.3d 729, 733 (8th

Cir. 2002) (evidence was presented of the officers' knowledge of a substantial risk of a fire or the explosion of a methamphetamine lab); *United States v. Spinelli*, 848 F.2d 26, 29-30 (2d Cir. 1988) (evidence was presented that the officer was aware of the highly volatile nature of the manufacture of methamphetamine). But see *United States v. Jackson*, 199 F. Supp. 2d 1081, 1090 (D. Kan. 2002) (despite the officers' detection of a strong chemical odor and suspicions that methamphetamine was being produced in the residence, the government failed to prove the existence of exigent circumstances because no testimony was entered into evidence regarding the officer's knowledge of the danger of an explosion or the volatility of methamphetamine); *United States v. Warner*, 843 F.2d 401, 404 (9th Cir. 1988) (there was evidence of the officer's knowledge of the potential explosive nature of stored chemicals, but the lack of a perception of an immediate emergency did not justify a warrantless entry); *United States v. Bonitz*, 826 F.2d 954, 957 (10th Cir. 1987) (the officers' alleged fears regarding the explosive nature of undisturbed gun powder and ammunition was not sufficiently supported by the record to establish exigent circumstances).

In the case at bar, there was no evidence presented by the State that the officers were aware of a current dangerous condition or that there was in fact a dangerous condition as a result of an active methamphetamine lab. We do not find that this element of a justification of exigent circumstances was shown by the evidence presented.

Regarding the fourth factor, as a result of the search by Mr. Ramsey the officers were aware there was a handgun in the cabin with pellets next to it. While the constitutional proscription against unreasonable searches and seizures does not normally apply to a search or seizure carried out by private individuals, it will apply if they are acting as agents or instruments of the State. See *Barber*, 94 Ill. App. 3d at 815, 419 N.E.2d at 72-73. After Deputy Washburn informed Mr. Ramsey that he believed there was a methamphetamine lab in the cabin, he showed him a color photo pamphlet used in officer training. The act of Deputy Washburn informing Mr. Ramsey of the particular items that might be found at a location where methamphetamine was being produced effectively made Mr. Ramsey an agent of the State. Mr. Ramsey entered the cabin as an agent of the police, not to accomplish some normal housekeeping function. As we observed earlier, the items that were found by Mr. Ramsey were the products of an illegal search.

Even if we allowed the argument that Mr. Ramsey, as the owner of the cabin, would have been allowed to enter the property and would have been able to identify the gun that was sitting in plain view on the shelf, a gun is not sufficient on its own to create exigent circumstances. No evidence was presented at the hearing from which

it could be inferred that defendants "exhibited some sign of a violent character." *Abney*, 81 Ill. 2d at 171, 407 N.E.2d at 548. Therefore, the trial court did not err in finding that the presence of a pellet gun in the cabin did not create an exigent circumstance sufficient to authorize a warrantless entry into the cabin.

The fifth factor is whether the officers were acting on a clear showing of probable cause. In order to determine whether probable cause exists to effectuate a warrantless search, a court must look to the totality of the circumstances and make a practical, commonsense decision whether there was a fair probability that an offense was committed and that the defendant committed it. *People v. Tisler*, 103 Ill. 2d 226, 237, 469 N.E.2d 147, 153 (1984), citing *People v. Wright*, 41 Ill. 2d 170, 174, 242 N.E.2d 180, 183 (1968). In determining whether the officer had probable cause, the officer's factual knowledge, based on prior law enforcement experience, is relevant. *Tisler*, 103 Ill. 2d at 237, 469 N.E.2d at 153, citing *People v. Smith*, 95 Ill. 2d 412, 419-20, 447 N.E.2d 809, 812 (1983). In this case, the combination of Deputy Washburn finding the blister pack, Clyde's suspicious behavior, Susan's trips to the convenience store, the strong odor of ether, the officers' knowledge that ether is involved in the manufacture of methamphetamine, and defendants rearranging and hiding items after the officers knocked on the door were the basis for the officers' determination that probable cause existed. The critical factor would appear to have been the odor of ether.

Courts across the nation have held that the detection of an odor associated with methamphetamine, by itself or with other evidence, is sufficient to establish probable cause to support the issuance of a *search warrant*. See, *e.g.*, *State v. Bowles*, 28 Kan. App. 2d 488, 18 P.3d 250 (2001) (information supplied to the police by local store owners that the resident had bought equipment that might be used for manufacturing methamphetamine and the evidence from two police officers that they had detected the strong odor of ether emanating from the resident's home); *United States v. Cervantes*, 219 F.3d 882 (9th Cir. 2000) (a police officer and an investigator detected a strong chemical odor outside the residence and believed it was consistent with methamphetamine production, and the same police officer and investigator observed a large hydraulic press in the apartment and a stainless steel pot on the kitchen floor, which contained a brown chunky substance that they believed was methamphetamine, and this was sufficient to create probable cause); *United States v. Mueller*, 902 F.2d 336 (5th Cir. 1990) (a police officer's detection of the odor of methamphetamine, emanating from a private residence, was sufficient evidence to establish probable cause for the issuance of a search war-

rant for the private residence, as the police officer was trained and knowledgeable with regard to the odor of the chemicals used in the manufacture of methamphetamine), *denial of postconviction relief vacated on other grounds*, 168 F.3d 186 (5th Cir. 1999); *Chavez v. State*, 769 S.W.2d 284 (Tex. App. 1989) (information in the search warrant affidavit, which outlined the landlord's detection of an odor associated with a methamphetamine lab, and the police captain's detection of the odor of phenyl acetone emanating from the house established probable cause for the issuance of the search warrant); *United States v. Sweeney*, 688 F.2d 1131 (7th Cir. 1982) (the agent's detection of an odor, which he attributed to the manufacture of methamphetamine, emanating from an open door of a private residence was sufficient to establish probable cause for the issuance of a search warrant for the private residence, as the agent was experienced in the detection of the distinctive odors associated with methamphetamine production); see also Annotation, E. Lauzon, *Odor Detectable by Unaided Person as Furnishing Probable Cause for Search Warrant*, 106 A.L.R.5th 397 (2003); *People v. Franklin*, 159 Ill. App. 3d 923, 929-30, 512 N.E.2d 1318, 1321 (1987) (sufficient probable cause was established regarding a PCP lab, based on the agent's detection of the odor of ether emanating from the defendant's apartment, in addition to the agent's knowledge that ether is used in the drying stage of PCP, the defendant's purchase of various chemicals used in the manufacture of PCP, and the discovery of a major precursor of PCP in the alley behind the defendant's apartment).

In the case at bar, the information available to the officers prior to their forced entry into the cabin may well have justified the issuance of a search warrant by a judge of the circuit court, but we do not find that the trial judge erred in determining that there was not *a clear showing of probable cause* to justify a finding of exigent circumstances. This distinction at first glance may appear to be slight, but it is consistent with the overriding principle that "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton v. New York*, 445 U.S. 573, 585-86, 63 L. Ed. 2d 639, 650, 100 S. Ct. 1371, 1379-80 (1980), quoting *United States v. United States District Court*, 407 U.S. 297, 313, 32 L. Ed. 2d 752, 764, 92 S. Ct. 2125, 2134 (1972).

The sixth factor is the likelihood that defendants would have escaped if they were not swiftly apprehended. Here, the cabin had only one door and three windows, which the police were watching. If defendants had attempted to leave, the police would have seen them and would have been able to stop them. Additionally, at least until the officers knocked on the door of the cabin, defendants were unaware

that the police were conducting surveillance of the cabin. Thus, they would not have been concerned with leaving as soon as they could. See, *e.g.*, *People v. Pierini*, 278 Ill. App. 3d 974, 978-79, 664 N.E.2d 140, 144 (1996) (since the officers' presence was known to defendant and his wife, had the officers delayed in order to obtain a warrant, the drugs may have been destroyed). This is also not a case where the police could be concerned that defendants would dispose of the drugs. This cabin did not have a sink or a toilet. There was no evidence presented regarding how defendants could have disposed of the various bottles, syringes, or other methamphetamine-manufacturing paraphernalia or the methamphetamine itself that was found in the cabin. Nevertheless, we note that even if it was possible to dispose of the drugs, the Illinois Supreme Court has expressly declined to establish a bright-line rule that the easy disposability of drugs *per se* creates exigent circumstances when drugs are the subject of the investigation. *People v. Ouellette*, 78 Ill. 2d 511, 519, 401 N.E.2d 507, 510 (1979).

Finally, this is not a case where the entry was peaceful. See, *e.g.*, *People v. Garcia*, 296 Ill. App. 3d 769, 779, 695 N.E.2d 1292, 1299 (1998) (a peaceful entry since the door to the house was open and unlocked); *Pierini*, 278 Ill. App. 3d at 979, 664 N.E.2d at 144 (although not consensual, the officers' brief incursion into the defendant's apartment to seize one of the cannabis cigarettes was peaceable and minimal). The events at issue in this case occurred on January 18, at 8:30 p.m. The Okaw Valley Campground was nearly empty. After the police knocked, defendants turned off their lights. The cabin door was then kicked in, and four police officers entered the small cabin, in darkness, with weapons drawn, and found defendants lying in their beds. Based on this evidence, we find that the trial judge did not err in determining that this method of entry was not peaceful.

Looking at the totality of the circumstances, we conclude that the trial judge's finding that there was insufficient evidence presented from which it could be determined that exigent circumstances existed which would have allowed the police to make a warrantless entry onto defendants' property was correct.

The State's final contention on appeal is that if this case lacks sufficient exigent circumstances to justify the warrantless entry, then Clyde's consent to search within a few minutes of the forced entry into the cabin and following his arrest justifies the admission of the evidence seized. We disagree. Clyde's consent is ineffective because it was " 'inextricably bound up with [the State's] illegal conduct and [could not] be segregated therefrom.' " *People v. Freeman*, 121 Ill. App. 3d 1023, 1032, 460 N.E.2d 125, 131 (1984), quoting *People v.*

*Kelly*, 76 Ill. App. 3d 80, 86-87, 394 N.E.2d 739, 744 (1979); see also *People v. Raibley*, 338 Ill. App. 3d 692, 704, 788 N.E.2d 1221, 1232 (2003).

## CONCLUSION

For the foregoing reasons, we affirm the circuit court of Fayette County.

Affirmed.

KUEHN, J., concurs.

JUSTICE WELCH, dissenting.

I respectfully dissent. I agree, as indeed do the parties, with the basic facts espoused in the majority opinion. I do not, however, agree with the conclusions the majority draws from those facts, nor with the conclusions of the trial court. I begin by making a distinction of law the majority fails to make: the eight-factor exigent circumstances test used by the majority to justify the trial court's ruling was intended by the Illinois Supreme Court to apply to situations where the crime for which the warrantless arrest was made was not committed in the presence of the arresting officers and where time had passed between the commission of the crime and the arrest. Indeed, *every* case the majority cites in support of the eight-factor test involved such a situation. *People v. Williams*, 161 Ill. 2d 1, 15-17, 28, 641 N.E.2d 296, 301-02, 306 (1994) (the offense was not committed in the presence of the police, and the defendant was arrested 27 hours later); *People v. Foskey*, 136 Ill. 2d 66, 72-73, 554 N.E.2d 192, 196 (1990) (the offenses were not committed in the presence of the police, and the defendant was arrested approximately one month after the offenses began); *People v. White*, 117 Ill. 2d 194, 202, 206, 512 N.E.2d 677, 678, 680 (1987) (the offense was not committed in the presence of the police, and the defendant was arrested 11 days later); *People v. Yates*, 98 Ill. 2d 502, 511-12, 456 N.E.2d 1369, 1374 (1983) (the offense was not committed in the presence of the police, and the defendant was arrested four days later); *People v. Abney*, 81 Ill. 2d 159, 162, 407 N.E.2d 543, 544 (1980) (the offense was not committed in the presence of the police, and the attempt to arrest the defendant was made at the defendant's home, not the location of the offense, one and a half hours later).

The Illinois Supreme Court has devised a *different* exigent circumstances test for situations where the crime was committed in the presence of the arresting officer and the arrest immediately fol-

250

lowed. In *People v. Eichelberger*, 91 Ill. 2d 359, 369, 438 N.E.2d 140, 144 (1982), the Illinois Supreme Court held that a police officer may arrest a person without a warrant when the officer has reasonable grounds to believe that the person the officer seeks to arrest is committing or has committed a felony in the presence of the officer. The court added, "An offense is committed in an officer's presence when knowledge of the commission of an offense is acquired through any of his senses." *Eichelberger*, 91 Ill. 2d at 369, 438 N.E.2d at 144. The court went on to hold that where the offense was committed in the presence of an officer, that officer could enter the premises where the offense occurred without a warrant for the purpose of making a warrantless arrest. *Eichelberger*, 91 Ill. 2d at 369, 438 N.E.2d at 145. The premises in question was a hotel room rented by the defendant. *Eichelberger*, 91 Ill. 2d at 369, 438 N.E.2d at 145. The Illinois Supreme Court specifically found that the commission of a felony in the presence of a police officer was in and of itself an exigent circumstance and that no additional exigent circumstances were required, stating, "The fact that the officers reasonably believed that a felony was being committed in their presence demanded prompt police action and constituted an exigent circumstance which justified the warrantless entry into the hotel room and the arrest." *Eichelberger*, 91 Ill. 2d at 369, 438 N.E.2d at 145. I note that subsequent to its publication, *Eichelberger* has never been overruled or even criticized by the Illinois Supreme Court. I note as well that although in *Eichelberger* the entry into the rented room in question was not forced, the *Eichelberger* court did not restrict its holding to situations where there has been no forced entry. *Eichelberger*, 91 Ill. 2d at 370, 438 N.E.2d at 145. Because in the case at bar the police had a reasonable belief that a felony was being committed in their presence, the exigent circumstances test of *Eichelberger*, rather than the eight-factor test relied upon by the majority, should be applied to this case. When that is done, it is clear that the arrest of the Gotts was proper.

When Deputy Washburn lawfully approached the Gotts' cabin at the request of Mr. Ramsey, Deputy Washburn discovered a burned blister pack and noticed an unusual chemical odor. As the majority notes, the trial court specifically found that Deputy Washburn had been authorized to make each of these discoveries. On the basis of Deputy Washburn's prior experience with illegal methamphetamine labs, he grew suspicious and Mr. Ramsey's search of the cabin followed. Surveillance of the cabin was instituted, and sometime after 8 p.m. officers observed Clyde Gott exit the cabin and pour a clear liquid onto the ground. According to the sworn testimony of four police officers—two of whom witnessed the pouring and two of whom arrived

moments later—the strong smell of ether immediately permeated the surrounding area. The defendants contend that there are legitimate uses for ether, and indeed there are, but common sense should inform this court that people using ether for legitimate purposes generally use it in aerosol form and certainly do not, as a general rule, go outside on cold winter nights to pour containers of liquid that reek of ether onto the ground. The defendant, the trial court, and the majority have not posited a legitimate use of ether that would have led to such a remarkable sequence of events. To the contrary, any police officer at all familiar with the manufacture of methamphetamine could and almost certainly would, when Clyde Gott's actions are coupled with Deputy Washburn's earlier lawful discoveries, entertain a reasonable belief that the manufacture of methamphetamine, a felony, was occurring within the cabin. The constitution does not require police officers to abandon experience and common sense.

Accordingly, as soon as the officers recognized the odor of ether emanating from the area where Clyde Gott dumped the clear liquid, they had the right under *Eichelberger* to make a warrantless arrest of the occupants of the cabin. By the time all four officers had confirmed the presence of the odor, however, Clyde Gott had returned to the inside of the cabin. Under *Eichelberger*, to effect their lawful warrantless arrest the officers had the right to enter the cabin as well. Because the officers had been advised that both a hunting knife and a handgun might be present in the 10-foot by 10-foot cabin—and recall that the trial court correctly found that the officers had the right to treat the "apparent" firearm as an actual deadly weapon until such item was conclusively found to be otherwise—the officers proceeded with caution, forcing their way into the cabin only when their attempts to peacefully engage the Gotts were ignored. I believe that under *Eichelberger*, the officers were within their rights to enter the cabin in the manner in which they did. Accordingly, the arrest of the Gotts was proper. Because it was obtained pursuant to this lawful arrest, the consent obtained from the Gotts, minutes after they were arrested, to search the cabin was proper as well. Under these circumstances, I believe that the evidence obtained from that legal, consensual search was not tainted, regardless of whether evidence obtained as the result of Mr. Ramsey's earlier, improper search of the cabin would have been tainted. This is particularly so when one considers the fact that Susan Gott had made two trips to town since the first search had been conducted, a fact that renders suspect the proposition that evidence seized in the second search was necessarily identical or even remotely similar to that which would have been seized as the result of the first search.

Likewise, although it may be argued that absent the evidence found in the first search, the police would not have ordered the surveillance of the cabin—and that, of course, without surveillance the officers never would have seen Clyde Gott disperse the clear liquid that reeked of ether—I do not believe that is necessarily true. Rather, I believe that even if Mr. Ramsey had reported that he had found nothing suspicious in his search of the cabin, Deputy Washburn, on the basis of the burned blister pack and the unusual chemical odor, would have been justified in setting up surveillance and on the basis of his previous experience with illegal meth labs in all likelihood would have done so. Accordingly, the surveillance itself was not a poisonous product of Mr. Ramsey's search of the cabin; rather, it was the result of Deputy Washburn's earlier, completely lawful discovery of a burned blister pack and an unusual chemical odor. Thus, even if one discards Mr. Ramsey's search and the fruits thereof entirely, the officers were still justified in conducting the surveillance of the cabin and in making the arrests they made.

For the foregoing reasons, I would reverse the decision of the trial court suppressing the evidence and would remand the cause for the Gotts to stand trial for the crimes they are alleged to have committed. Unless and until the Illinois Supreme Court determines that *Eichelberger* is no longer good law, I believe we are required to follow it. Because the majority chooses to do otherwise, I respectfully dissent.