No. 3-05-0075

_____

Filed January 26, 2007.

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Tenth Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02-CF-0342 |
| GLEN R. PLANTE, | ) ) | Honorable Peter J. Ault, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McDADE delivered the opinion of the court:

_____

A grand jury indicted defendant, Glen R. Plante, for unlawful manufacture of 900 grams or more of a substance containing methamphetamine, possession with the intent to deliver 900 grams or more of a substance containing methamphetamine, and possession of 900 grams or more of a substance containing methamphetamine. Prior to trial, defendant filed a motion to quash arrest and suppress evidence seized from his home on May 6, 2002. The circuit court of Tazewell County denied defendant's motion. Following a jury trial, the court convicted defendant and sentenced him to concurrent 25-year terms of imprisonment for unlawful manufacture and possession with intent to deliver. Defendant appeals, arguing the court erred in denying his motion to quash and to suppress because a police officer entered his home, arrested him, and seized evidence without a warrant, without consent, and absent exigent circumstances justifying a

warrantless entry. For the reasons that follow, we reverse and remand.

BACKGROUND

Defendant's motion to quash his arrest and suppress evidence alleged that Deputy Sheriff Jeffrey Bass made a nonconsensual and warrantless entry into defendant's home whereupon Bass arrested defendant and seized a number of items. At a hearing on the motion, defendant testified that he was at his home on the day in question with Penny Wood, his girlfriend, and Robert Rusterholz, his friend, when defendant observed a police vehicle pull up to the home. Defendant approached the vehicle and asked Bass if there was a problem. Bass asked if defendant knew why he came to his home and defendant replied he thought Bass might be investigating a local ordinance violation related to the number of vehicles parked at defendant's home. Bass told defendant he would "check on it" and return.

Ten minutes later, Bass returned and defendant consented to Bass's entering his home. Defendant had a large number of electronic devices in his home in connection with an electronics repair business. Bass asked defendant if he possessed any stolen property and defendant replied he did not but that Bass was free to take any stolen property that might be present. Defendant allowed Bass to search for stolen property. Bass searched the home, including a room containing two toolboxes. During the search, defendant told Bass he thought Bass may be investigating a possible theft of telephone services. This was because the previous day, defendant repaired a temporary telephone line running between his home and an adjacent county building. Defendant showed Bass a work order concerning the telephone line.

Bass left and returned 10 minutes later accompanied by Detective Darrell Stoecker. The officers told defendant they were investigating a theft of toolboxes and wanted to check the serial

numbers on the toolboxes in defendant's home. Defendant allowed the officers to enter and, after checking the serial numbers, the officers asked defendant what was upstairs. Defendant allowed the officers upstairs then returned to the first floor. The three men entered the kitchen, where Bass asked defendant the location of the basement. Defendant indicated the entrance to the basement and Bass entered. Bass returned three minutes later and both officers left.

Five to 10 minutes after Bass and Stoecker left, Wood and Rusterholz were leaving carrying laundry. Defendant stood in the doorway, holding the screen door open for Wood and Rusterholz, where they encountered Bass and Stoecker. Stoecker stopped Wood and Rusterholz and Bass grabbed the screen door. Bass stood in front of defendant with his arm extended. Bass told defendant he needed to speak to him inside the house. Defendant asked Bass if they could talk outside and Bass replied "No." Bass moved his hand as though to escort defendant inside the home. Defendant then entered the home and Bass followed. Bass told defendant they needed to speak in the basement and asked what was going on there and where the lab was. Bass then escorted defendant to the basement and placed him under arrest.

Bass also testified at the hearing on defendant's motion. Bass testified consistently with defendant's testimony, with the following additions: Bass went to defendant's home to investigate a possible theft of telephone services. The sheriff's office had also recently received a tip that persons were engaged in drug trafficking from defendant's residence. After leaving the first time, Bass spoke to Stoecker and they devised a plan to investigate the possible theft of telephone services in which Bass would return to the residence and Stoecker would call the county number at a designated time to see if the line rang in defendant's home. Bass returned to defendant's home and defendant invited him to enter. When Bass left the second time, he again

-3-

spoke to Stoecker and told him about the toolboxes. Stoecker had been investigating a theft of similar toolboxes.

When Bass asked defendant about the basement, defendant told him the basement was flooded. Bass insisted on seeing the basement and discovered the basement was in fact flooded. There, he smelled ammonia. Defendant remained on the bottom of the stairs but Bass crossed some running boards to a corner of the basement. He observed what he considered to be a methamphetamine laboratory. When Bass and Stoecker left the residence, Bass took Stoecker to the rear of the home and told him what he observed. The officers contacted the State's Attorney's office for advice on how to proceed. An assistant State's Attorney told Bass that he should have arrested defendant while Bass was still inside and that Bass would have to gain defendant's permission to reenter the home.

Bass and Stoecker went to the door, where they encountered Wood and Rusterholz. Bass testified defendant was at the front door when he spoke to him. Bass further testified as to his encounter with defendant as follows:

"A. And I said, I want to talk to you about something. He said, 'Can we do it out here?' I said, no, I am going to talk to you inside and talk about it. And so we walked into the dining room.

Q. When you say, we walked into the dining room, how did that happen?

A. He turned around [and] walked in the house. I followed him and he turned like you and I are, and stood face to face, and I said, Mr. Plante, what is going on[?]

-4-

\* \* \*

Q. As of the time you entered the residence behind [defendant], he hadn't verbally said, come on in or okay or anything of that sort?

A. No, he walked towards the dining room and I followed him. I said, I would like to talk to you in the house. We went into the dining room.

Q. And as of that time you didn't have a search warrant yet?

\* \* \*

A. I asked him, what has been going on here. And he acted like I asked him, what was going on in the basement. He denied doing anything. And I said, let's go take a look.

\* \* \*

I said let's go down and take a look. I made sure that he went down in front of me because for officer's safety, I knew I was going to arrest him, so he walked in front of me.

\* \* \*

Q. How did you make sure he went down in front of you?

A. I waited for him to walk towards me and I waited for him to initiate walking to the basement and he went down first and I followed him down and actually we walked, this time we both

walked across the [running boards] back into the corner where the lab was at that one time, and he turned and looked at me.

* * *

A. I arrested him and I went back and took inventory, and it's on the evidence sheet, my original inventory.

* * *

Q. Okay. Let me ask you this, when you had arrested him and then went back to the basement did you confine your discoveries to that 4 foot area [(where he initially observed the alleged lab)] or did you make other discoveries as well?

A. I had noticed some of the items had been moved from the area over to the drain. He had moved some stuff over to the drain. He had appeared to dump stuff and there was stuff scattered out from the 4 foot area.

Q. So you would have seized those items?

A. Yes.

Q. And then after the search warrant was obtained?

A. Right. I seized the items that I saw. Sure."

The trial court denied defendant's motion and the matter proceeded to trial. Following trial, the jury found defendant guilty of all three counts in the indictment. Defendant filed a post-trial motion arguing the court erred in denying his motion to quash arrest and suppress evidence. The court denied defendant's motion. This appeal followed.

-6-

ANALYSIS

We will reverse the trial court's ruling on a motion to suppress evidence only if it is manifestly erroneous. *People v. Anthony*, 198 Ill. 2d 194, 201, 761 N.E.2d 1188, 1192 (2001). Defendant contends Bass made his third entry into the home without consent and absent any exigent circumstances to justify a warrantless entry. Bass then proceeded to arrest defendant and conduct a warrantless search of the premises. Therefore, defendant argues, police conducted an illegal search of his basement and any items seized are the fruits of the illegal arrest and search and must be suppressed.

The State responds the evidence was "overwhelming that the defendant voluntarily consented to the search of his home." In support of its position, the State initially relies upon facts related to Bass's first two entries into defendant's home. For example, the State notes that "the defendant took the officer around his house, showing him the different rooms *** pointed out the basement door to the deputy and *** even turned on the basement light for the deputy."

However, that evidence is irrelevant to a determination of whether defendant consented to Bass's third entry into defendant's home. The legality of each entry must be determined individually. See *People v. Koniecki*, 135 Ill. App. 3d 394, 400, 481 N.E.2d 973, 979 (1985) ("even though the initial entry into the residence was justified under the 'emergency' exception to the warrant requirement *** the second entry into the basement *** must be separately analyzed for its legality"); *People v. Finley*, 293 Ill. App. 3d 377, 383, 697 N.E.2d 1154, 1161 (1997), quoting *United States v. Diaz*, 814 F.2d 454, 459 (7th Cir. 1986) ("'We do not intend to suggest by our analysis that one consensual entry means that law enforcement agents may thereafter enter and exit a home at will'") (applying the "consent once removed" doctrine)).

"A well-settled, specific exception to the fourth amendment's warrant requirement is a search conducted pursuant to consent." *People v. Pitman*, 211 Ill. 2d 502, 523, 813 N.E.2d 93, 107 (2004). "Consent is not valid unless it is voluntary, and in order for consent to be voluntary, it must be freely given without duress or coercion (express or implied)." *People v. LaPoint*, 353 Ill. App. 3d 328, 332, 818 N.E.2d 865, 868 (2004).

> "'In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.' [Citation.] *** [T]he State bears the burden of proving the consent was truly voluntary." *Anthony*, 198 Ill. 2d at 202, 761 N.E.2d at 1192, quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 229, 36 L. Ed. 2d 854, 864, 93 S. Ct. 2041, 2049 (1973).

In support of its position that defendant consented to Bass's final entry into defendant's home, the State relies on testimony that defendant stepped back into the house and the deputy followed him. The State notes that "Deputy Bass did not yell or scream or threaten him" and "did not push the defendant."

Defendant did not consent to Bass's third entry into the home. Defendant never told Bass that he may enter the home on his third attempt and specifically asked if they could speak outside. The State relies on defendant's "nonverbal conduct" in walking back into the home after Bass demanded to speak inside to support its theory of consent. While "'there is little authority as to what constitutes consent in the absence of an express verbal statement'" (*Anthony*, 198 Ill. 2d at

202, quoting *People v. Henderson*, 142 Ill. 2d 258, 298 (1990)) the supreme court has recognized that "'mere acquiescence to apparent authority is not necessarily consent'" (*Anthony*, 198 Ill. 2d at 202, quoting People v. Kelly, 76 Ill. App. 3d 80, 87 (1979)). Bass admitted that he told defendant "I am going to talk to you inside." This is not a request. It is an evident display of "apparent authority" to which defendant merely acquiesced.

The State's repeated assertion that Bass never "yelled, screamed, *** threatened [or] touched" defendant is both unavailing and misplaced. Consent may not be "extracted 'by explicit *or implicit* means, by implied threat or covert force." (Emphasis added.) *Anthony*, 198 Ill. 2d at 202, 761 N.E.2d at 1192, quoting *Bustamonte*, 412 U.S. at 228, 36 L. Ed. 2d at 863, 93 S. Ct. at 2048 (1973). Bass's tactics were more than "subtly coercive." Bass at minimum implied that force would be employed to secure his final entry when he blocked defendant in the door to the residence and stated affirmatively his intent to enter in spite of defendant's request to speak outside.

Finally, the State concedes that it never argued, and the trial court never found, that exigent circumstances justified Bass's warrantless search of defendant's home. The State admits that the court denied the motion to suppress solely on the basis of its finding that defendant consented to the search. Nonetheless, the State argues that the dangerousness of chemicals used to manufacture methamphetamine provide sufficient grounds to find exigent circumstances justifying a warrantless entry into defendant's home.

"The Illinois Supreme Court has recognized the following

factors as relevant to a determination of exigency in circumstances

involving a warrantless entry into a private residence to effectuate

-9-

an arrest: (1) whether the crime under investigation was recently committed, (2) whether there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained, (3) whether a grave offense was involved, particularly a crime of violence, (4) whether there was reasonable belief that the suspect was armed, (5) whether the police officers were acting on a clear showing of probable cause, (6) whether there was a likelihood that the suspect would escape if he was not swiftly apprehended, (7) whether there was strong reason to believe the suspect was in the premises, and (8) whether the police entry was made peaceably, albeit nonconsensually." *People v. Gott*, 346 Ill. App. 3d 236, 242, 803 N.E.2d 900, 908 (2004), citing *People v. Williams*, 161 Ill. 2d 1, 25-26, 641 N.E.2d 296, 306 (1994).

Defendant argues that "there was no evidence that Deputy Bass had reason to believe that the suspected methamphetamine laboratory presented any imminently dangerous condition." Defendant also cites *Gott*, 346 Ill. App. 3d at 245, 803 N.E.2d at 908, for the proposition that where "there was no evidence presented by the State that the officers were aware of a current dangerous condition or that there was in fact a dangerous condition as a result of an active methamphetamine lab," the third or "grave offense" factor for a finding of exigent circumstances is not satisfied. The State failed to cite any evidence of Bass's belief or knowledge of the level of danger in defendant's home or whether any danger actually existed. The State merely relies on the "common knowledge that a meth lab is a fire hazard and hazardous chemicals are used to

-10-

manufacture methamphetamine."

The evidence is insufficient to support a finding that Bass believed that a currently dangerous condition existed in defendant's home. The evidence is, in fact, to the contrary. Bass testified that he suspected the presence of a methamphetamine lab following his second entry into defendant's home. However, Bass did not arrest defendant and did not alert, as the State says he had reason to, "the proper authorities to dismantle and dispose of these hazardous chemicals." Instead, he had a 5-10 minute conversation with Stoecker at the rear of the allegedly dangerous house.

To support a finding of exigent circumstances justifying a warrantless entry, the State must produce evidence of the officer's belief an imminent threat exists. See *Gott*, 346 Ill. App. 3d at 244-45, 803 N.E.2d at 908 (and cased cited therein). No such evidence exists in this case nor does the evidence support an inference Bass held such a belief. The State offers no other grounds for finding that exigent circumstances justified Bass's third entry into defendant's home. Accordingly, we cannot affirm the trial court's order denying defendant's motion to quash arrest and seize evidence on these grounds.

CONCLUSION

Because defendant did not consent to Bass's third entry into the home, his arrest and the subsequent search of his home were illegal. See *People v. Finley*, 293 Ill. App. 3d 377, 382, 687 N.E.2d 1154, 1158 (1997) ("The Fourth Amendment 'prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest'" [citations], "even with probable cause, unless the entry was consented to, or unless there were 'exigent circumstances' [citations]"). Further, because the arrest and search were invalid,

-11-

any evidence obtained must be suppressed.  See *People v. Wimbley*, 314 Ill. App. 3d 18, 35, 731 N.E.2d 290, 302 (2000) ("The warrantless entry was illegal, and all the evidence seized therein is suppressed").  For the foregoing reasons, the circuit court of Tazewell County's order denying defendant's motion to quash arrest and suppress evidence and defendant's conviction are reversed.

Reversed and remanded for further proceedings consistent with this opinion.

LYTTON, P.J. and SCHMIDT, J., concur.